58 A.3d 62

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Jose DeJESUS, Appellee.**

**Commonwealth of Pennsylvania, Appellee**

v.

**Jose DeJesus, Appellant.**

Supreme Court of Pennsylvania.

Submitted June 30, 2010.

Decided Dec. 14, 2012.

Hugh J. Burns, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

Elizabeth Ann Larin, Billy Horatio Nolas, Federal Community Defender Office, Eastern District of PA, James H. Moreno, Defender Association of Philadelphia, Philadelphia, for Jose DeJesus.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

These are cross-appeals in a capital matter from the Order of the Court of Common Pleas of Philadelphia County granting partial relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.[1] The Commonwealth appeals the PCRA court's order insofar as it grants relief on Jose DeJesus's claim that he is ineligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), because he is mentally retarded. DeJesus cross-appeals the PCRA court's concurrent denial of his various other PCRA claims.[2] For the following reasons, we find that the PCRA court erred in denying the Commonwealth's motion to reopen, and accordingly, we vacate the PCRA court's decision and accompanying order of August 10, 2007, which found appellee mentally retarded and vacated his death sentences, but otherwise denied relief. This matter is remanded for further *Atkins* proceedings consistent with this Opinion.

1. The Commonwealth has filed a Motion to Correct Omission in the Record, stating that DeJesus's Exhibit 38 at the PCRA hearing, a score sheet used to estimate his adaptive function level under the "Adaptive Behavior Assessment System" ("ABAS"), was not included in the record transmitted to this Court. The unopposed motion is granted.

2. Because we address the Commonwealth's appeal primarily, we will refer to DeJesus as "appellee." Appellee raises 12 claims in his cross-appeal, challenging the performance of trial and appellate counsel with regard to both the guilt and penalty phases of his trial; he also seeks restoration of his right to direct appeal, challenges imposition of the death penalty as a general matter, alleges cumulative error, and claims broad entitlement to hearings and the ability to amend his already-extensive pleadings.

## I. FACTS & PROCEDURAL BACKGROUND

The convictions underlying this appeal arose from appellee's active role as co-conspirator and shooter in the May 30, 1997 murders of Felix Vargas and Elizabeth Carrasquilla,[3] who was pregnant at the time, as well as the shooting of two other bystanders who survived. The assaults occurred at about 11:00 p.m. at the intersection of Franklin and Indiana Streets in North Philadelphia and were carried out by means of AK–47 assault rifles. Vargas, a drug dealer, was pronounced dead at the scene from multiple gunshot wounds to the head, neck, and chest that he suffered while sitting in his car. Carrasquilla, who was speaking with Vargas through Vargas's car window at the time she was shot, died a short time later from at least one gunshot wound to her back.

The Commonwealth established at trial that appellee participated in a meeting earlier that day with several co-defendants, all of whom were involved in a drug dealing organization led by co-defendant Elias Pagan, a rival of Vargas. The meeting entailed a discussion of killing Vargas, who had recently shot one of Pagan's dealers, Carlos Robelos. Robelos vowed to kill Vargas in revenge, and Pagan told Robelos that he would pay Robelos for killing Vargas. Robelos then enlisted appellee to help him kill Vargas. Shortly thereafter, when reports came that Vargas was in the area, Pagan provided appellee and Robelos with AK–47 rifles, pistols, and ski masks to wear during the attack. After the murders, appellee and Robelos each received $2,500 from Pagan.

Appellee was not apprehended until nearly four months later on September 23, 1997; during the intervening months, he committed two additional murders, for which he later received death sentences.[4] He also evaded police officers who

3. This victim's name appears in the record as both "Carrasquilla" and "Carrasquillo." For purposes of consistency, this Opinion will use "Carrasquilla."

4. On June 20, 1997, appellee fired an AK–47 assault rifle multiple times from the roof of a building on Palethorp Street in Philadelphia, shooting onto and into an automobile that appellee believed was being driven by "Capone," a man with whom appellee was engaged in an ongoing

tried to apprehend him by car and on foot after spotting him in a car stopped at an intersection in Philadelphia on September 2, 1997.

Pertinent to this appeal, in July 1998, prior to appellee's trial for the murders in this case, the trial court ordered a pre-sentencing mental health evaluation of appellee in connection with one of his other murder convictions (the June 1997 killing described in footnote 4). This evaluation was conducted by psychologist Albert Levitt. Dr. Levitt's original handwritten notes include the phrase "mental retard mild." Dr. Levitt, Handwritten Notes, 7/10/98, at 1. Dr. Levitt's final report did not indicate retardation. Instead, the report summarized appellee's youth and background, including appellee's recollections that he began smoking marijuana daily when he was 14 years old and using cocaine and PCP regularly at 16 years old. Appellee recalled being in juvenile facilities during his teenage years, which Dr. Levitt supplemented with information that appellee's first experience with the juvenile system occurred in 1991, when appellee, who was born in April 1979, would have been approximately 12 years old; he was placed on probation for simple and aggravated assault. Appellee also committed simple and aggravated assault in 1994 and was adjudicated delinquent in 1996 for carrying a firearm. Appellee was then placed in the "Vision Quest" program (which will be further discussed *infra*). Dr. Levitt's report stated that appellee had poor judgment, auditory hallucinations, "paranoid and morbid thought processes," and "inappropriate assumptions." Dr.

dispute. The victim was actually not "Capone," but Carlos Martinez, who had bought the car from "Capone" earlier that day; two bystanders in the immediate area were also hit by stray gunfire. *Commonwealth v. DeJesus*, 584 Pa. 29, 880 A.2d 608 (2005) (affirming conviction of first-degree murder, lesser crimes, and sentence of death; PCRA petition pending). Later that summer, in the early morning hours of August 24, 1997, appellee shot David Sims multiple times after a quarrel near the corner of Randolph Street and Allegheny Avenue in Philadelphia, as Sims tried to run away. Eleven shots hit Sims, including in his back. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102 (2004) (affirming convictions of first-degree murder and lesser crimes, but granting new death penalty hearing due to improper "send a message" comments to jury by prosecutor during initial penalty hearing).

Levitt's psychological assessment was of poly-substance abuse, with a secondary diagnosis of "schizotypal personality with aggressive anti-social tendencies." Dr. Levitt concluded that appellee did not suffer from major mental illness and that despite appellee's "poor emotional condition and background," he was "capable of understanding a sentencing procedure." Dr. Levitt Report, 7/30/98, at 1–3.

On August 5, 1999, a jury sitting in the Court of Common Pleas of Philadelphia County convicted appellee of two counts of first-degree murder for the killings of Vargas and Carrasquilla, along with various lesser charges. After the penalty phase, the same jury found four aggravating circumstances and no mitigating circumstances, and imposed death sentences on both murder charges. The aggravators were that appellee was paid by another person for killing Vargas, knowingly created a grave risk of death to another person in addition to the victim, had a significant history of violent felony convictions, and had been convicted of another murder.[5] The trial court formally imposed the death sentence on August 17, 1999.

On direct appeal, this Court unanimously affirmed appellee's convictions and death sentence. *Commonwealth v. DeJesus*, 567 Pa. 415, 787 A.2d 394 (2001), *cert. denied, DeJesus v. Pennsylvania*, 537 U.S. 1028, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002). In March 2003, appellee filed a *pro se* PCRA petition and counsel was subsequently appointed. But, on January 27, 2004, the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO"), entered an appearance for appellee as *"pro bono* counsel."[6] The FCDO filed a lengthy

---

**5.** 42 Pa.C.S. §§ 9711(d)(2), (d)(7), (d)(9), & (d)(11).

**6.** Appellee was represented at trial by Joseph Canuso, Esq., and on direct appeal by Joseph Marinaro, Esq., who was appointed after imposition of the death sentence. On March 3, 2003, the same day appellee filed his *pro se* PCRA petition, Anne Saunders, Esq., and Robert Brett Dunham, Esq., of the FCDO filed an Emergency Motion for Stay of Execution, which the PCRA Court granted on March 10, 2003. On March 19, 2003, James S. Bruno, Esq. was appointed by the PCRA court to represent appellee.

However, on January 27, 2004, Attorney Saunders and James Moreno, Esq., both of the FCDO, filed a *praecipe* for entry of appearance as *pro bono* counsel. On January 28, 2004, Attorney Bruno was granted

amended PCRA petition on June 9, 2004, alleging numerous instances of ineffective assistance of counsel, trial court error, and challenges to the constitutionality of appellee's death sentence. These challenges were both general (for instance, a claim that Pennsylvania's methods and procedures in conducting executions violate the U.S. and Pennsylvania Constitutions) and specific, particularly the claim that, under *Atkins,* appellee is mentally retarded and therefore is retroactively ineligible for the death penalty.

Hearings on appellee's *Atkins* claim were held over 12 days from October 2006 through January 2007 before the Honorable Jane Cutler Greenspan. Appellee presented a multitude of witnesses: mental health experts, family members, childhood acquaintances, and school teachers and counselors. The mental health experts testified to various aspects of mental retardation and their opinions that appellee fit the clinical criteria for the condition. Dr. Antonio Puente, a psychologist, opined that appellee fell "smack in the middle of the mild mental retardation range" within both the AAMR [7] and DSM–IV [8] standards, and that it would be "difficult to fake" his performance on IQ tests. Dr. Puente also believed that appellee's mental deficits most likely manifested before he turned eighteen. On cross-examination, the prosecutor contrasted the potential effects of appellee's teenage drug use when compared with his earlier school records, which indicated intelligence and natural leadership; the prosecutor also

permission to withdraw and was replaced by the FCDO, who have represented appellee ever since. At the *Atkins* hearings, and at two further proceedings in June 2007 on the Commonwealth's motion to reopen, appellee was represented by Attorney Moreno as well as by Billy H. Nolas, Esq. and Elizabeth Green (now Larin), Esq., of the FCDO, whose names also appear on the briefs to this Court. At the hearings below the FCDO presented: six mental health experts; six teachers, coaches, or counselors; two female relatives; and three other friends or relatives who were serving prison sentences around the state. All told, the *Atkins* proceedings resulted in nearly 2000 transcribed pages and voluminous exhibits.

7. American Association on Mental Retardation (now known as the American Association on Intellectual and Developmental Disabilities).

8. *See* Diagnostic and Statistical Manual of Mental Disorders DSM–IV (4th ed.1994) and DSM–IV–TR (4th ed. text rev.2000).

noted the absence of any suggestion of mental retardation in appellee's post-incarceration pre-*Atkins* records and evaluation reports, such as the pre-sentence report from 1999 in this case. Dr. Puente conceded that drug use may have "played a role" in appellee's academic decline and that it was difficult to reconcile appellee's positive early school achievements, particularly in math, where he tested in the ninetieth percentile three times, with a diagnosis of mental retardation. N.T., *Atkins* Hearing, 10/23/06, at 49, 51, 77, 79, 131, 149–56, 171, 176, 189–98, & 205–14.

Gerald Cooke, Ph.D., also a psychologist, opined that appellee was mentally retarded, with an overall IQ of 61 and intellectual and adaptive deficits that would have manifested before he turned 18. Although Dr. Cooke understood that someone could "fake an IQ test," he believed that appellee "was exerting effort, that he was trying to do well" and that the distribution of appellee's responses (he did relatively well on easier questions and worse on more difficult questions) suggested that appellee was not "faking mental retardation." Dr. Cooke added that the Slosson Intelligence test, which appellee took in 1991, 1994, and 1996 (coinciding with his experiences in the juvenile system), and on which he received scores of 84, 109, and 99, above the range of mental retardation, was no longer viewed as a valid IQ indicator. Dr. Cooke stated that from his experience in the juvenile and criminal justice systems, he believed that less intelligent individuals were often recruited for menial positions within organized drug groups, such as "mules," "enforcers," or low-level sellers. Dr. Cooke opined that appellee's level of intelligence, competence, and lack of self-direction was consistent with that type of activity. N.T., *Atkins* Hearing, 10/25/06, at 13, 20, 32–41, 47–55, & 104–05.

Dr. Cooke appeared surprised to learn that in another criminal matter, appellee purportedly testified falsely to crimes in an effort to "take the rap" for a friend, German Cruz. According to Dr. Cooke, appellee's low level of mental "sophistication" seemed inconsistent with the sort of purposeful deception and strategy required to fabricate testimony of a

crime committed by another person. Nevertheless, Dr. Cooke felt that appellee's current testing results indicated that "basically, [appellee] is now a 27–year–old adult reading and doing arithmetic at the level of a third to fourth grader" and that he was not "malingering" when tested. Dr. Cooke did not assign much value to appellee's positive evaluations from "Vision Quest," an alternative juvenile residential program.[9] Dr. Cooke related that he had often heard that Vision Quest inflated reports and results and even provided answers to make the program appear more effective than it was. On cross-examination, Dr. Cooke conceded that appellee knew why he was being evaluated and that the results could affect his efforts to overturn his death sentence: "Well, on the face of it, you would think somebody would want to do badly under those circumstances, but that is not what I saw." Dr. Cooke acknowledged that nothing in the pre-incarceration evidence on appellee suggested an IQ below 70 and also that prior to *Atkins,* only one notation had been made that appellee might suffer from mental retardation (Dr. Levitt's 1998 handwritten note mentioned above). Dr. Cooke expressed skepticism that appellee's purportedly false testimony in the German Cruz case revealed significant intelligence; he was similarly ambivalent with regard to statements appellee evidently made about being able to independently acquire plane tickets and travel to and from Puerto Rico. N.T., *Atkins* Hearing, 10/25/06, at 113–15, 118, 138–39, 157–58, 168, 237–38, 250–51, 296–99, & 310.

Dr. John Gregory Olley, another psychologist, testified next, opining that appellee was mentally retarded and had been manifestly so prior to the age of 18. Dr. Olley focused on appellee's adaptive behavior, which refers to judgment, self-control, communications with others, and problem-solving. Dr. Olley testified that a background of poverty may be a factor leading to mental retardation or other developmental delays, due in part to poor nutrition, medical care, and edu-

9. Vision Quest is licensed by the Pennsylvania Department of Public Welfare and regulated by the Pennsylvania Department of Education. It is a residential program for juveniles and other troubled youths and offers programs based on themes from Native American and Western American history and culture.

cational screening and opportunities. On cross-examination, Dr. Olley opined that the simpler aspects of appellee's allegedly false testimony in the Cruz case could be managed by a mentally retarded person, but that other aspects of the testimony, such as recall and retelling of the details of drug trading and the actual crimes, might not be consistent with mental retardation. Dr. Olley also conceded that appellee's early teenage drug use could have been a factor leading to his increased criminal activity and his decline at school. Dr. Olley believed that appellee was "trying his best to answer my questions within his ability," but admitted that appellee had an incentive to do poorly on an *Atkins* evaluation. N.T., *Atkins* Hearing, 10/26/06, at 7–8, 10, 77–83, 172–96, 200–01, & 250–57.

Dr. William Russell, another psychologist, testified that the Slosson tests, which appellee took three times between 1991 and 1996 with scores well above the range for mental retardation, were no longer viewed as credible by the mental health profession. Dr. Russell added that a spread of over 20 points, like appellee's, suggested that some problem occurred with either the administration of the prior tests or the calculation of the results. Dr. Russell added that in his general experience with the juvenile system, where appellee may have taken those tests, counselors were often overwhelmed by the volume of evaluations, which could have affected accuracy. Moreover, Dr. Russell stated that to the extent Slosson results may still be viewed as effective, they are seen as likely to overstate a subject's IQ. N.T., *Atkins* Hearing, 10/30/06, at 129–40, & 173.

Appellee next called Dr. Najma Davis, a clinical therapist and social worker who had worked for the FCDO and its affiliates for twenty years between 1978 and 1998, to contest appellee's success in Vision Quest. Dr. Davis testified that Vision Quest was viewed as a positive program in an outdoor rural setting that focused on discipline, life skills, cooperation with others, and behavior modification. In Dr. Davis's opinion, one of Vision Quest's weaknesses was the failure to provide consistent therapy and education along with its activities and programs. Dr. Davis believed that participants' improvements "on paper" at Vision Quest were often exagger-

ated and did not comport with what she observed when participants returned to the juvenile or school systems. In Dr. Davis's view, "it appeared that the [Vision Quest] reports had been inflated" because the returning youths "typically ... were functioning under grade level." N.T., *Atkins* Hearing, 10/31/06, at 6–10, & 12.

Dr. Paul Delfin, a clinical psychologist, testified that tests seeking to determine whether a subject is malingering have not yet been reliably developed, but, in his view, because appellee succeeded at easier questions and struggled on harder questions, malingering was not evident, and the results indicating mental retardation more likely represented "either mild mental retardation or a cognitive disorder." Dr. Delfin echoed Dr. Russell's view that the Slosson test is unreliable and tends to return inflated IQ scores. Dr. Delfin did not necessarily believe that appellee's false testimony in the German Cruz matter was inconsistent with mild mental retardation and speculated that it could have been the result of good "coaching." On cross-examination, Dr. Delfin testified that while appellee's early positive school results may have been consistent, they were not necessarily accurate or reliable and that appellee's subsequent academic decline was likely because he had reached the upper level of his intellectual capacity. N.T., *Atkins* Hearing, 10/31/06, at 43–45, 67, 99, 114, & 117–20.

Appellee also called various lay witnesses from his past schools. His first-grade teacher at the Laura W. Waring School ("Waring"), Grace Bullock, said that she had thought appellee was mentally retarded. She recalled him to be low-functioning, unable to control himself or make friends, unable to communicate, follow instructions, play simple group games, or to stay focused on tasks. She speculated that appellee's positive standardized test scores may have been the result of cheating. N.T., *Atkins* Hearing, 10/24/06, at 35–36. Betty Cam, a counselor at Ludlow Elementary School ("Ludlow"), testified that although appellee's early grades may have been acceptable, he was in remedial programs where grades were largely individualized and not based on comparison with other students. Ms. Cam opined that appellee "appeared slow" to

her. On cross-examination, Ms. Cam confirmed that at no time did any teacher express concerns to her that appellee might be mentally retarded. Ms. Cam opined that, in retrospect, appellee should have been screened for retardation, but he "fell through the cracks." N.T., *Atkins* Hearing, 10/24/06, at 62–65, 79, & 113–16.

Michael Lugo, who coached appellee in baseball when appellee was 12 or 13 years old, testified that appellee had some difficulty with aspects of baseball that required judgment; that other children called appellee "slow, stupid and dumb"; that appellee was not able to manage money; and that appellee was often reckless, like diving off the top level of a fountain. Mr. Lugo was aware that appellee used drugs when he coached him in baseball, but stated that he had told appellee not to arrive high to practice or games, and he believed appellee had obeyed that instruction. N.T., *Atkins* Hearing, 10/24/06, at 185–92, 199–200, & 202–04.

Luis Pagan, currently serving a life sentence at the State Correctional Institution ("SCI") at Greene for murder and other offenses, testified that he had known appellee since childhood. Pagan testified that appellee did not understand the rules of basketball or how to handle money. Pagan added that he and appellee had abused drugs, including PCP, together on several occasions, but he thought appellee was retarded even without having done drugs. On cross-examination, Pagan answered in the affirmative when asked whether he wished appellee could "get off of death row and do life like the regular guys." N.T., *Atkins* Hearing, 10/26/06, at 111, 119, & 152. Elias Pagan, currently incarcerated at SCI–Fayette serving four life sentences for murder (including those of Vargas and Carrasquilla, the subject of this appeal, for which Pagan and appellee were convicted as co-conspirators), testified that he knew appellee as a child in Puerto Rico and that the two met again in Philadelphia when appellee was 17 and Pagan was 23. Pagan testified that he ran drug operations and employed appellee as a bodyguard, protector, and enforcer. Pagan testified that appellee never sold drugs and was unable to handle money: "His intelligence wasn't that good.

He was a slow man, like retarded." Pagan added that he had to teach appellee how to load an AK-47, that it took a lot of repetitive instruction to do so, and it did not come easily to appellee. According to Pagan, appellee remained his enforcer because appellee would do anything Pagan told him to do and the two were friendly enough to spend most of each day together. N.T., *Atkins* Hearing, 10/30/06, at 47, 50, & 67–69.

Appellee also called family members. His younger half-brother, Luis Andino, who was serving a sentence at SCI–Graterford for aggravated assault, testified that he believed appellee was "kind of slow" and recalled that appellee had trouble learning to tie his shoelaces even though he was three years older than Andino. Andino believed that in Elias Pagan's drug operation, appellee was a "flunky." When questioned how appellee eluded the police for so long (nearly four months), Andino indicated that appellee would have been protected by the drug dealer (or dealers) who employed him because he would do whatever he was told. N.T., *Atkins* Hearing, 10/27/06, at 43–44, 49, & 68–69. Minerva Rivera, appellee's cousin and his elder by 12 years, testified that she had a younger sister roughly the same age as appellee but that appellee was much less capable than that sister in personal hygiene and eating habits. Rivera testified that once appellee began using illegal drugs regularly, his temperament changed negatively and he became angry, agitated, nervous, and out of control. N.T., *Atkins* Hearing, 10/27/06, at 88–92, & 104–08. Antonia Colon, appellee's older sister, stated that she lived with and nearby appellant from the time he was nine or ten until he turned 18. Colon testified that appellee had a key to her residence and often stayed there, but did not understand how to take baths or that chicken should not be eaten until it is fully cooked. Colon stated that she would do appellee's homework for him because he could not do it himself; she believed appellee was "slow" compared to other children his age. N.T., *Atkins* Hearing, 10/30/06, at 9–10, 12, & 15.

The Commonwealth rebutted appellee's evidence by first calling Carl Rone, a former police officer from Delaware who

was a ballistics and firearms expert. Rone testified that while the murder weapon in this case was never recovered, there was no dispute that it was an AK–47 assault rifle. On cross-examination, Rone testified that an AK–47 is one of the easier firearms to load and shoot and that there is only one way to load and shoot it correctly or the weapon will not function. N.T., *Atkins* Hearing, 11/29/06, at 21, 32–34, & 37.

The Commonwealth then called several experts to refute appellee's evidence of mental retardation. Dr. George Carl Denkowski, a clinical psychologist, did not credit appellee's IQ score of 52 from the Stanford–Binet test, indicating mental retardation, because he observed that appellee was both anxious and depressed, which would have negatively affected performance; appellee also performed poorly on tests designed to measure a subject's efforts. In another test, the Rey 15–Item Performance evaluation, Dr. Denkowski remarked that appellee received varying scores when he gave appellee the test and when Dr. Puente had conducted it roughly eight months earlier. According to Dr. Denkowski, appellee's test efforts and results varied so much that all of his results could be questionable. N.T., *Atkins* Hearing, 11/29/06, at 48–54, 59, 62–66, & 78–79.

Dr. Denkowski also critiqued Dr. Puente's opinion of mental retardation as warranting little weight in light of appellee's suspect performance effort. In Dr. Denkowski's opinion, the only "constant" in appellee's test scores was his inconsistent, even poor, performance and effort. Moving to appellee's adaptive abilities, Dr. Denkowski critiqued the results of the test given by Dr. Olley on grounds that appellee's score of 27 was so low that if it were accurate, appellee would be so severely retarded that it would be "glaringly obvious even to laypeople." Dr. Denkowski explained that testers must distinguish whether a subject is capable of performing well, but chooses not to, and whether the subject simply does not have the mental capacity to perform well; in Dr. Denkowski's view, this reality introduces subjectivity into what is thought of as "objective" testing. In terms of adaptive functioning, Dr. Denkowski placed less weight on anecdotal evidence of appel-

lee's inability to tie his shoes and more weight on appellee's pre-incarceration ability to navigate his neighborhood, purchase things, conduct drug business by renting corners, have girlfriends, give presents, leave tips, and similar social skills. N.T., *Atkins* Hearing, 11/29/06, at 80–90, 103, 107–08, & 117–19.

Drawing on witness testimony from appellee's trial for Carlos Martinez's murder, Dr. Denkowski noted that appellee had refused to surrender himself when a girlfriend suggested he do so. Dr. Denkowski deduced that appellee was far from being a follower and felt that appellee was, in fact, "extremely self-directed. He is highly independent. No one is going to tell him what to do." Dr. Denkowski opined that appellee's testimony in the Cruz proceedings was too interactive, detail-oriented, and intelligible to be that of a mentally retarded person. Dr. Denkowski also questioned Dr. Olley's results from testing appellee's "receptive language" skills, such as understanding what one is being told, and "expressive language" skills, such as being able to speak and communicate with others. Dr. Olley had scored appellee more than twice as high on expressive skills (at the level of a ten-year-old child) as on receptive skills (at the level of a four-year-old child). In Dr. Denkowski's view, such incompatibility is nearly impossible because expressive skills are more difficult and it would be rare for them to so greatly outstrip receptive skills, indicating, at the least, something askew with the intake information. Further noting that Dr. Olley's results were based largely on appellee's cousin Minerva Rivera's reporting, Dr. Denkowski opined: "What it indicates to me is that there was an active effort to portray [appellee] as being impaired and she just didn't know how to do it, so she came up with these unusual score patterns. . . ." Dr. Denkowski also indicated that he did not believe that appellee's voluntary drug use would have resulted in the sort of enduring brain change or damage that would lead to mental retardation. N.T., *Atkins* Hearing, 11/29/06, at 124, 130, 136, & 147.

Unlike appellee's experts, Dr. Denkowski expressed no discomfort with the Slosson test. He acknowledged that it was a

fairly minimal screening tool, but also believed that a score on a full IQ test would generally correspond "very closely" to a Slosson score. Dr. Denkowski attributed the disparity in appellee's Slosson test scores from the 1990s (84, 109, and 99) to the likelihood that appellee's effort varied, which affected his results. Dr. Denkowski's review of appellee's school records indicated average or normal performance through fifth grade and "adequate mental ability" prior to the age of 18. Dr. Denkowski's ultimate opinion was that appellee is not mentally retarded. N.T., *Atkins* Hearing, 11/29/06, at 152–58, & 169–75.

On cross-examination, Dr. Denkowski was questioned on how it could be judged whether appellee had the "capability to manipulate" the various tests given for *Atkins* purposes. Dr. Denkowski stated: "I believe it is quite simple to withhold effort" and that appellee "was not putting forth consistent effort." Regarding the drop-off in appellee's school performance, Dr. Denkowski posited that although appellee did reasonably well when he began in Spanish-speaking classes, he got "derailed" once he was switched to English-speaking classes, "which I think really undercut him. I don't think he ever recovered from that completely." Dr. Denkowski opined that by the time appellee reached fifth or sixth grade, he had already become "disengaged from the educational process." N.T., *Atkins* Hearing, 11/29/06, at 179–84, 215–17, 271, & 280.

When questioned about his own testing of appellee, Dr. Denkowski indicated that he believed the bulk of appellee's responses, such as that appellee could not perform certain basic tasks like cutting food into bite-size pieces, buckling a seatbelt, and arriving on time to places, reflected "lifestyle" choices and lack of motivation, not mental retardation. Dr. Denkowski explained that the adaptive ability test he used is meant to measure individuals within a "mainstream social lifestyle" and not within "the criminal socio-culture," where motivation and lifestyle have different effects. Dr. Denkowski believed that because of the likelihood that "inadequate effort was exerted," all of appellee's recent post-*Atkins* test scores

were of questionable reliability. N.T., *Atkins* Hearing, 11/30/06, at 25–40, 43, & 78.

The Commonwealth also called Dr. Beth Ann Rosica, vice president of service delivery at Vision Quest, the program appellee attended as a teen in 1994 through 1996, at which time Dr. Rosica was the program's national director of education. Dr. Rosica described Vision Quest as a program that accepts juvenile delinquents and other at-risk young people via judicial assignment. Dr. Rosica described the Pennsylvania program as primarily therapeutic and behavioral, but also educational, using the "Wagon Train" format, which involved actual mules and carriages and trips up and down the East Coast and was intended to engage youths and create positive social ethics and patterns. N.T., *Atkins* Hearing, 12/1/06, at 28–36.

Dr. Rosica stated that Vision Quest was not designed for mentally retarded individuals and that a youth screened and found to be mentally retarded would be transferred to "a more appropriate environment." Dr. Rosica had never met appellee, but indicated that his recorded scores were not low enough to warrant referral for special education. Dr. Rosica added that when youths arrived at Vision Quest, they were still generally quite angry and unhappy and their scores could be "a bit of an under-representation of where the kids really were, grade equivalency-wise." Dr. Rosica stated that appellee's exit records from Vision Quest demonstrated significant improvement, which supported the view that entry scores can be an under-representation and showed the positive impact the program could have on youths like appellee. Dr. Rosica denied that Vision Quest inflated or manipulated participants' scores and evaluations. N.T., *Atkins* Hearing, 12/1/06, at 37–45, 56, 64–65, & 80.

Under cross-examination, Dr. Rosica acknowledged that Vision Quest is a for-profit entity whose funding depends, at least in part, on successful outcomes. When questioned whether positive exit reports were undermined by academic and behavioral problems when students left the program and returned to public schools, Dr. Rosica replied that the transi-

tion from a secluded, structured, and well-funded environment like Vision Quest back to urban living and public schools could be problematic. Dr. Rosica added, however, that the program's success rate with Philadelphia youths was viable enough that placement was continuous. She stated: "our numbers were always high . . . with Philadelphia kids." Dr. Rosica noted that after appellee left Vision Quest, his attendance at the program's affiliated high school in Philadelphia was sporadic, his performance declined, and he ultimately was returned to the program. N.T., *Atkins* Hearing, 12/1/06, at 96, 104–06, 137–38, & 148–50.

Dr. Paul Spangler, a psychologist and the Director of Clinical Services for Philadelphia's Office of Mental Retardation Services, testified that he was aware of the *Atkins* decision and had reviewed appellee's available documentation. In Dr. Spangler's view, appellee's test results, while divergent, were all within the "average" range. Dr. Spangler opined that while all tests have flaws, the Slosson test, on which appellee thrice scored above the recognized median ranges for mental retardation, was consistent enough with other testing methods that it was still recognized and used. Dr. Spangler, who focused on appellee's intellectual status prior to 18 years old, testified that he "saw nothing there to indicate mental retardation." On cross-examination, Dr. Spangler maintained that any testing or information obtained with regard to *Atkins* after a subject turns 18 is suspect because it is retrospective and could also be the result of bias or manipulation. For that reason, Dr. Spangler had limited his own evaluation to the available documentation prior to age 18, which revealed no indication or suggestion of mental retardation. Dr. Spangler added that drug use, even in early teenage years, would not lead to mental retardation even though a subject's scores could be negatively affected by slowed reaction time or decreased motivation. N.T., *Atkins* Hearing, 1/4/07, at 18, 22, 47, 71–72, 142–43, 168–71, & 174–76.

The Commonwealth also called appellee's trial counsel, Joseph Canuso, Esq. Attorney Canuso testified that he was retained by appellee's family and did not recall them telling

him that appellee might have mental or communicative difficulties; Attorney Canuso also did not recall "anything unusual about our communications" or believe that appellee did not understand what was transpiring before and during his trial. Attorney Canuso stated, however, that other than the court-ordered examination performed by Dr. Levitt in association with appellee's other death penalty proceedings, he did no further independent investigation into appellee's mental capacity as a possible sentencing mitigator. He explained that decision by noting that he agreed with Dr. Levitt that although appellee exhibited some "deficiencies," there was nothing dramatic enough to pursue further. Attorney Canuso stated that while *Atkins* had not yet been handed down at the time of appellee's trial, if he had suspected that appellee was mentally retarded, he would have "done something about it." N.T., *Atkins* Hearing, 11/30/06, at 136–39, 142–44, & 152.

On rebuttal, appellee called Dr. Daniel Martell, a clinical psychologist from California. Dr. Martell did not personally evaluate appellee, but reviewed the documents and watched a DVD of Dr. Denkowski's evaluation of appellee. Dr. Martell remarked that the testing appellee underwent while incarcerated consistently demonstrated an IQ of approximately 61, which was consistent with appellee's documentation and anecdotal evidence. According to Dr. Martell, this "convergent validity" was significant; he discounted the possibility that appellee malingered or manipulated the results. In Dr. Martell's view, even if appellee intended to perform poorly, the consistency of his various results would be "very difficult" to achieve deliberately. N.T., *Atkins* Hearing, 1/4/07, at 206–09, 222–54.

Dr. Martell also testified that although appellee had others write letters for him from prison, which could indicate illiteracy or trouble with English, it was just as likely to be a deficit in adaptive functioning. Dr. Martell acknowledged appellee's background and drug use as viable considerations for the sharp decline in his childhood academic performance, but added, "I think it is a mistake to rule out a lack of intellectual horsepower" as a contributing factor. Dr. Martell did not

view Slosson tests as valid reflections of IQ. Dr. Martell opined that Dr. Denkowski's methods were likely to "lead" appellee to correct answers and inflate his scores away from the range of mental retardation. Dr. Martell's ultimate opinion was that appellee "has mental retardation and he meets the diagnostic criteria." N.T., *Atkins* Hearing, 1/4/07, at 256, 264, 267, 296–97, 302, & 321.

On cross-examination, Dr. Martell acknowledged that appellee's heavy daily drug use and difficult home and community life situation likely contributed to his academic drop-off, but opined that these other factors did not discount the probability of mental retardation. Dr. Martell further conceded that even though he viewed the Slosson IQ test as unreliable, he had not previously seen an instance where a mildly mentally retarded individual, tested three times over five years, attained scores consistently within the average range of intelligence and above the range indicating mental retardation, even though the scores themselves diverged from each other. N.T., *Atkins* Hearing, 1/5/07, at 14–16, 33–36, 41, & 65.

On May 21, 2007, before the court issued a decision on appellee's *Atkins* claim, the Commonwealth filed a motion to reopen the record, asserting that it had recently received information from prison officials at SCI–Greene that shed substantial doubt on appellee's claims of mental retardation. The Commonwealth posited that "even within the confines of death row," appellee had conspired with other inmates and outsiders to have cell phones smuggled to him in late September 2006, prior to his *Atkins* hearings, and to keep the phones for over two weeks until October 17, 2006, the day before he was transported to Philadelphia for his *Atkins* hearings. The Commonwealth alleged that appellee made approximately 134 calls to friends and family and managed to also send text messages and photographs. Records and information indicated at least 15 calls to the residence of appellee's cousin Minerva Rivera, who subsequently testified on his behalf. The Commonwealth alleged that appellee's ability to recall phone numbers and to acquire and use a cell phone was remarkable for a supposedly mentally retarded person who

had been incarcerated since 1997, when cell phone technology (such as text-messaging and cameras) was less advanced and common.

In support of its motion to reopen, the Commonwealth also argued that, in addition to other evidence of appellee's relatively high ability to function while in prison (working, keeping an account), appellee may have used the smuggled cell phones to encourage his *Atkins* witnesses to "exaggerate his impairments" in order to secure a favorable ruling. The Commonwealth noted that the possession of cell phones by a number of SCI–Greene death row inmates, including appellee, was shortly to be submitted to a grand jury for further investigation and requested that the court reopen the record, allow the grand jury to conclude its investigation, wait until all of the evidence could be proffered, and then consider the results before making its ultimate *Atkins* determination.

A hearing on the Commonwealth's motion was held on June 4, 2007. The prosecutor stated that two cell phones had been smuggled into SCI–Greene, one inside the spine of a hardcover dictionary. Although one phone was received by another inmate, Rasheed Simpson, and may have been used by other inmates, the prosecutor expressed confidence that the phone was ordered by and intended for appellee, who allegedly made the bulk of the calls from the phone, as shown by detailed call records the Commonwealth obtained from T–Mobile. In response, Attorney Nolas of the FCDO argued that the level of cell phone use at issue was consistent with someone capable of functioning at a sixth-grade level, which is considered the extent of development that mildly mentally retarded persons can achieve. Attorney Nolas added that the cell phone calls appellee made were to phone numbers that appellee would already have had for his family and attorneys, so memorization was not necessary. Moreover, Attorney Nolas argued that none of the calls were relevant to *Atkins* because the bulk of *Atkins* evidence, such as the preliminary statements from appellee's family, had been taken prior to September 2006. Attorney Nolas also asserted that the Commonwealth's evidence pointed to 18 inmates in all, not just appellee, having

potentially used the phones, and that nothing showed that appellee could not have been taught how to use the phones by another inmate or that another inmate did not dial the phones for appellee.

The prosecutor responded that the Commonwealth had acquired a copy of an August 2006 letter to appellee from a woman named "Amy Leonard" that discussed various cell phone brands and appeared to be responsive to requests from appellee about cell phones; the prosecutor emphasized that this new evidence, if considered in context and in its totality, conflicted with appellee's claim of limited mental abilities. The prosecutor requested, as the Commonwealth had in its motion, that the court at least wait until the grand jury concluded its work before making any determination. The court expressed skepticism that it could ever be proven definitively that appellee used the phone himself or had other inmates work it for him, and took the Commonwealth's motion under advisement. N.T., 6/4/07, at 2–27.

On June 15, 2007, the court heard concluding arguments on the merits of appellee's *Atkins* claim. Attorney Nolas argued that appellee had established by a preponderance of the evidence that he had mild mental retardation that manifested when he was 11 or 12 years old, which preceded his consistent drug use, which began when he was 13 or 14 years old. The Commonwealth responded that the court should weigh most heavily the objective evidence prior to 1999, when appellee was sentenced to death, or prior to 2002 when *Atkins* was handed down, which contained no indication or suggestion of mental retardation, but rather, included comments that he was "an intelligent boy" and "a very good student." The Commonwealth further argued that appellee's heavy and daily use of multiple drugs, as early as 12 years old, was the likely cause of his precipitous academic decline; that none of the anecdotal recollections of appellee's lay witnesses, who were likely biased, pointed to appellee being mentally retarded; that appellee was no mere follower, but an individual who manifested his own will and self-possession throughout his life, up to and including the multiple murders; and that there was a "power-

ful motivation" for appellee to do poorly on the post-*Atkins* tests.

On July 31, 2007, the PCRA court denied the Commonwealth's motion to reopen, issuing the following order:

And now this 31st day of July, 2007, this Court hereby denies the Commonwealth's motion to reopen the record. *See Commonwealth v. Smith* [548 Pa. 65], 694 A.2d 1086 (Pa.1997) ("It is within the trial court's discretion to allow either side to reopen its case, prior to judgment, to prevent a failure or miscarriage of justice"; no error to deny reopening for testimony of an expert psychologist where his testimony would have been cumulative).

The PCRA court's subsequent opinion did not provide any further explanation or discussion of its reasons for denying the Commonwealth's motion to reopen, or its disinclination to await the conclusion of the grand jury investigation.

Respecting *Atkins*, the opinion noted that *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), set forth the requirements for establishing an *Atkins* claim. The claimant must show three elements by a preponderance of the evidence: (1) substantial intellectual impairment (limited intellectual functioning); (2) impact of this impairment on the defendant's everyday life (deficits in adaptive functioning); and (3) manifestation prior to 18 years of age (early onset). Under *Miller*, the court noted, the criteria for establishing mental retardation derive from the definitions provided by the DSM–IV and the AAMR, which differ only in that the DSM–IV considers the severity or mildness of a subject's retardation. PCRA Ct. Op., 8/10/07, at 22.

The PCRA court concluded that appellee had met his burden to prove limited intellectual functioning. In the court's view, the Commonwealth's evidence and argument that appellee malingered on his post-*Atkins* tests, while "compelling," did not "carry the day." The court agreed with appellee's experts that his early results within the average range on the Slosson test did not merit much weight in light of the inconsistency of the scores, the "general obsolescence" of the test, and

its unsuitability for diagnostic and forensic purposes. The court also credited defense expert Dr. Martell's speculation that appellee's consistently normal early scores were likely inflated by the assistance of Spanish-speaking instructors who may have helped students understand and answer the questions. Finally, the court did not credit appellee's performance at Vision Quest, describing the asserted improvements as too dramatic to be credible and also potentially enhanced by the program's incentive to report positive results as a means of securing funding. *Id.* at 24–26.

The PCRA court also concluded that appellee had proven deficits in adaptive functioning. The court credited appellee's post-conviction scores on the test he took for adaptive deficits, which fell within the mental retardation range of 56 to 73. The court also credited appellee's lay witnesses' anecdotal testimony regarding appellee's early intellectual and developmental deficits and weaknesses, particularly Coach Lugo's testimony. The court opined that this element was a close call, but that the weight of the evidence tipped "ever so slightly in defendant's favor." *Id.* at 26–28.

Finally, as to the third *Atkins* prong, early onset or evidence of impairment prior to age 18, the PCRA court concluded that appellee had met his burden. The court viewed appellee's decline in fifth and sixth grades as a "strong indicator of mental retardation," more so than earlier records that described appellee as within the normal intellectual range. The court credited appellee's evidence that mildly retarded children may appear and perform normally early on before reaching their limitations. The court also credited the anecdotal testimony (while acknowledging its likely bias) of appellee's lay witnesses regarding his difficulties dressing himself and understanding games, and his dependence on others for help with day-to-day living. The court stated that while appellee's drug use was a likely factor in his decline, his "intellectual limitations likely played a greater role in his deterioration" and, as with his deficient adaptive functioning, "the scales tip ever so slightly in favor of the defense." The court stated in its accompanying order that because appellee is

mentally retarded, his death sentences would be corrected to life sentences without parole. Notably, the court's opinion did not address its denial of the Commonwealth's motion to re-open the record. *Id.* at 28–30, 40. The PCRA court also addressed the merits of the claims raised by appellee in his cross-appeal, rejecting them all.

The Commonwealth's appeal challenges the PCRA court's decision to award appellee *Atkins* relief from his death sentences, posing the following two questions:

I. Applying a properly defined standard, did defendant's evidence—which the lower court found "ever so slightly" tipped the scales in his favor—support relief under *Atkins v. Virginia?*

II. Are further proceedings warranted where new evidence came to light suggesting that defendant deceived the lower court regarding his actual abilities?

We will address only the Commonwealth's appeal for present purposes, deferring consideration of the cross-appeal until the *Atkins* issue has finally been resolved. ·

## II. ANALYSIS

### A. *Atkins* Review Paradigm on Collateral Attack

The Commonwealth first argues that this case demonstrates the deficiency of Pennsylvania's current method for *Atkins* determinations, the "clinical standard," which attempts to correlate non-legal diagnostic and treatment-oriented definitions of mental retardation (those of the DSM–IV and AAMR) with a retrospective evaluation of a convicted killer: "The facts of this case demonstrate the difficulties that arise when trial courts are forced to put the 'square peg' of post-conviction *Atkins* claims into the 'round hole' of clinical definitions intended for issues of treatment.... [T]reatment was never an issue here: no one ever suggested [that appellee] was mentally retarded prior to the *Atkins* decision, let alone diagnosed him with the condition." The Commonwealth points to other states' recognition of the "significant motivation" for defendants seeking *Atkins* relief to malinger on tests

that were not intended or designed for use in a legal or judicial context; to the Commonwealth, this teleological disjuncture creates an "inherently suspect circumstance." Commonwealth's Brief at 27–29.

The Commonwealth calls upon this Court to provide guidance by addressing this circumstance, suggesting that *Atkins* claimants be required to show mental retardation by clear and convincing evidence, or proof beyond a reasonable doubt, rather than by a mere preponderance of evidence. At a minimum, the Commonwealth warns, courts "should be directed to treat with particular caution the results of tests a capital murderer takes in developing a claim for *Atkins* relief." The Commonwealth further criticizes the clinical standard as mistakenly equating anti-social behavior, often seen in the criminal lifestyle, with the genuine deficits in adaptive function that manifest in mentally retarded individuals. The Commonwealth posits that the standard "as is," in a sense, rewards killers, who make the ultimate anti-social choice to commit murder, with immunity from the death penalty on a showing based upon pre-incarceration criminal choices and lifestyle. In this case, the Commonwealth asserts that, pre-*Atkins*, appellee's lifestyle and personal history reflected conscious choices to depart from normal and socially acceptable conduct, not mental retardation. Commonwealth's Brief at 30–36.

The Commonwealth also proposes that this Court look to the guidance articulated by the Texas Court of Criminal Appeals (Texas's highest appellate court in criminal cases) in *Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App.2004), concerning the "adaptive functioning" prong of the clinical test for mental retardation, in cases involving mental retardation assessments for death penalty purposes. The Commonwealth notes that, in his dissenting opinion in *Atkins*, Justice Scalia cautioned that the clinical definitions of mental retardation invited feigned claims. *See* 536 U.S. at 353, 122 S.Ct. 2242 (Scalia, J., dissenting) ("One need only read the definitions of mental retardation adopted by the American Association on Mental Retardation and the American Psychiatric Association ... to realize that the symptoms of this condition can readily

be feigned."). The Commonwealth further notes that the *Briseno* court attempted to reconcile the clinical standards with the "unique circumstances of capital litigation" by identifying additional "evidentiary factors" drawn from the *Atkins* decision itself.

As the Commonwealth indicates, *Briseno* indeed noted that "[t]he adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases." 135 S.W.3d at 8. The court then identified the following evidentiary factors for the factfinder to consider in "weighing evidence as indicative of mental retardation or of a personality disorder":

● Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

● Has the person formulated plans and carried them through or is his conduct impulsive?

● Does his conduct show leadership or does it show that he is led around by others?

● Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

● Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

● Can the person hide facts or lie effectively in his own or others' interests?

● Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

135 S.W.3d at 8–9.

The Commonwealth states that consideration of these or similar factors in *Atkins* determinations would mitigate problems with unreliable and biased backward glances and give more weight to "concrete and unbiased evidence of function." The Commonwealth adds that adoption of additional factors

like those in *Briseno* would also bring Pennsylvania more closely in tune with *Atkins* itself, which was intended to apply to a relatively small number of capital defendants who truly are mentally retarded, and not to become a vehicle for crafty defendants to evade the death penalty. Commonwealth's Brief at 37–40. The Commonwealth further explains in its brief why the *Briseno* factors further the actual underpinnings of the *Atkins* decision:

> [The *Briseno* factors] direct courts to focus on the types of concerns identified in *Atkins* in determining whether relief is warranted. In explaining its rationale for crafting a new protection for some capital murderers, the *Atkins* Court stated its view that the mentally retarded had "diminish[ed] ... personal culpability." This, in turn, was based upon the Court's understanding that, "by definition," the mentally retarded have "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." The Court further noted that the mentally retarded tend to act "on impulse," rather than through premeditated plans, and are "followers rather than leaders." The Court also noted that the mentally retarded have a lesser ability to assist counsel and "are typically poor witnesses." The factors set forth in *Briseno* focus courts upon these same types of considerations.

*Id.* at 40 (pinpoint citations omitted).[10]

The Commonwealth concludes its brief by proffering its application of the *Briseno* factors to this case: there is no indication that anyone who knew appellee during his developmental years identified him as mentally retarded; the murders here involved prior planning and premeditation, rational (albeit criminal and socially unacceptable) thinking, and follow-

10. The Commonwealth cites Tennessee, Florida, Ohio, Georgia, and Oklahoma as jurisdictions that, like Texas in *Briseno*, consider similar additional evidentiary factors. The Commonwealth also points to states that maintain heightened burdens of proof, citing Georgia and Arizona, which have required proof beyond a reasonable doubt and proof by clear and convincing evidence.

through; pre-*Atkins* records suggested that appellee was self-directed and a leader (or had leadership potential); appellee never displayed difficulty understanding or responding to questioning; and he was able to hide facts and lie effectively to forward his own or others' interests, as when he attempted to "take the rap" for his confederate German Cruz. The Commonwealth suggests that the PCRA court's grant of relief was likely due to the flawed and vulnerable clinical standard the court applied.

Appellee responds that the PCRA court's finding of mental retardation was supported by ample evidence and should not be disturbed. Appellee cites decisions where this Court has declined to alter the current standard when sought by defendants, including *Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612 (2007) and *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170 (2009), and avers that this Court should greet the Commonwealth's attempt to change the *Atkins/Miller* standard with similar reluctance. Appellee's Brief at 9–31. Appellee further argues that alteration of the *Atkins/Miller* standard along the lines proposed by the Commonwealth would drop Pennsylvania "below the constitutional minimum required by *Atkins*," and upset the "stability and clarity in the law." Appellee also submits that the Commonwealth's request to change the standard amounts to a concession that the PCRA court did not err in finding him mentally retarded under *Miller*. Appellee adds that the question of whether *Atkins* claimants have incentives to malinger on intelligence and aptitude tests was considered by the court below, and thus he has already overcome any presumption of malingering. Appellee's Brief at 31–39.

Appellee also disputes the notion that his extensive criminal conduct is the result of anti-social behavior rather than mental retardation; he claims that the PCRA court considered this question, too, and concluded that his criminal behavior derives from the adaptive deficits associated with mental retardation. Appellee asserts that if the standard is recalibrated, "a third of the definition on which *Atkins* and *Miller* are based" would be negated, which would violate the Eighth Amendment rights

of *Atkins* claimants, all of whom have been convicted of the ultimate anti-social act and most of whom have significant criminal or other anti-social personal histories. Appellee adds that anti-social behavior and mental retardation are not mutually exclusive and that the evidence of his own "maladaptive behavior" was not solely subjective or anecdotal, but was also revealed by post-*Atkins* test results. Appellee's Brief at 39–42.

The Commonwealth's request to alter the review paradigm for *Atkins* determinations on collateral attack is essentially twofold: (1) to alter and raise the defendant's burden of proof to clear and convincing evidence or proof beyond a reasonable doubt; and (2) to formally instruct PCRA courts to treat retrospective *Atkins* test results proffered by the defendant with caution, and to consider evidentiary factors such as those identified in *Briseno.* Establishing or recalibrating the proper standard for measuring *Atkins* claims in the collateral review setting poses questions of law, as to which our review is plenary. In considering the Commonwealth's challenge, we begin with an overview of the current approach in this Court's decisional law, including a significant decision handed down after this case was briefed, *Commonwealth v. Sanchez,* 36 A.3d 24 (Pa.2011), *cert. denied, Sanchez v. Pennsylvania,* —— U.S. ——, 133 S.Ct. 122, 184 L.Ed.2d 58 (2012).

*Atkins* held that the Eighth Amendment's prohibition on cruel and unusual punishment bars the execution of mentally retarded offenders. 536 U.S. at 321, 122 S.Ct. 2242. However, as this Court recently noted in *Sanchez, Atkins* "did not dictate either a national standard for determining which offenders are in fact mentally retarded, nor did it speak of a constitutionally-mandated procedure for determining mental retardation in capital cases." 36 A.3d at 52. Rather, *Atkins* specifically left " 'to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.' " *Id.* (quoting *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242). The States tasked with implementing *Atkins* have been faced with various gray areas: which side bears the burden of proof, whether proof should be by a preponderance

of the evidence, the substantive standard for assessing mental retardation, and the issue of retrospective assessments.[11] The *Atkins* Court did refer to the "clinical definitions" of mental retardation of the AAMR and American Psychiatric Association as "similar," but did not specifically hold that the States were required to embrace those definitions. The clinical definitions suggest a three-part test encompassing significantly sub-average intellectual functioning; significant limitations in adaptive skills such as communication, self-care, home living, social skills, self-direction, functional academics, health and safety, leisure, and work; and a manifestation of the condition before the age of 18. 536 U.S. at 308 n. 3 & 317, 122 S.Ct. 2242 (citations omitted).

This Court first addressed the effect of *Atkins* in *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202, 210–11 (2003), a direct capital appeal. Mitchell was tried, convicted of murder, and received a death sentence prior to *Atkins;* he raised his *Atkins* claim for the first time on direct appeal, relying upon a trial record that had not paid specific attention to the question of mental retardation. This Court held that it was not appropriate to make an *Atkins* determination based on a *post hoc* gleaning from such a trial record. Rather, we held that the issue was properly reserved to collateral review where the parties and the court could engage in directed advocacy, hold hearings, and develop a proper record. Notably, in footnotes, the *Mitchell* Court attempted to provide some direction to the lower court: we referenced the "accepted" clinical definitions of mental retardation that *Atkins* had cited, and by analogizing to determinations of criminal competency and sanity, we indicated that a defendant seeking *Atkins* relief bears the burden to prove mental retardation under the accepted definitions by a preponderance of the evidence. *Id.* at 210 nn. 7 & 8.

In the years since *Mitchell*, this Court has been called upon to decide other questions arising under *Atkins,* given the

11. The latitude expressed in *Atkins* concerning these issues does not preclude the possibility that the High Court may eventually step in and address some or all of these questions; it has not done so to date.

General Assembly's failure to address the policymaking implications of the decision. Thus, in *Miller* in 2005, a collateral appeal, we formally adopted the clinical definitions of mental retardation and the preponderance standard for collateral *Atkins* determinations; we also confirmed that a PCRA court cannot make an *Atkins* determination from existing record evidence on other questions, but must conduct an evidentiary hearing where there is an issue of material fact concerning *Atkins.* 888 A.2d at 631–33; *see also Crawley,* 924 A.2d at 615 (reaffirming *Miller* in context of capital defendant's request on serial PCRA review to adopt a different standard for measuring mental retardation). Both *Miller* and *Crawley* were rendered without a dissent.

Next, in *Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128 (2009), we concluded that when *Atkins* claims are raised on collateral review, there is no federal constitutional entitlement under the Sixth and Fourteenth Amendments to have the determination made by a jury. Instead, we enforced the Rules of Criminal Procedure, which designate judges as PCRA factfinders. *Id.* at 135, 140–41, 146 (citing *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); *see* Pa.R.Crim.P. 908(D)(1).

Our most recent and comprehensive consideration of *Atkins* issues was in *Sanchez,* which was decided in 2011, after this matter was briefed and submitted.[12] *Sanchez* was a direct appeal, not a collateral attack. We held that there is no constitutionally dictated right or "preference" affording defendants their choice of fact-finder for *Atkins* determinations made at the trial level (although the sides may stipulate in this regard), nor is there a constitutionally dictated right or preference for when the *Atkins* determination is to be made (prior to trial, after guilt phase, during penalty phase). 36 A.3d at 55–61. In light of continued legislative silence and the lack of a required national model or command, we devised in *Sanchez* a process for *Atkins* claims originating at the trial level in

12. The parties have not filed post-submission communications, nor have they sought to provide further briefing, in light of *Sanchez.*

Pennsylvania, a process which, *inter alia*, reaffirmed that the burden of proof is on the defense by a preponderance of evidence:

> After considering the arguments raised by the parties here, the centrality of the right to a jury in our constitutional system, concerns of judicial economy and administrative efficiency, as well as the experience of other states, we approve of the procedure that the trial court used in this case—*i.e.*, submitting a colorable *Atkins* issue to the jury for a penalty phase decision. We also agree with the trial court's determination ... that: (1) the burden is on the proponent of the *Atkins* claim, usually the defendant, to prove mental retardation by a preponderance of the evidence; (2) a finding of mental retardation, for purposes of death ineligibility under *Atkins*, must be unanimous; (3) and the jury should pass upon the *Atkins* mental retardation question before proceeding to consider the aggravators and mitigators, a consideration that will occur only if the defendant fails to carry his burden.

*Id.* at 62–63 (footnotes omitted).

The *Sanchez* Court addressed at some length the bases for each of these determinations. On the question most pertinent here, that of the propriety of a preponderance standard, we noted that the *Atkins* Court, "[h]aving surveyed the national landscape in discerning a trending consensus against capital punishment of the mentally retarded, ... was certainly aware that states which prohibited such executions at the time of the *Atkins* decision had already established procedures and 'had drawn in different places the line for establishing the mental retardation that would bar execution,' reflecting a 'disagree[ment among jurisdictions] over which individuals in fact have mental retardation.'" *Id.* at 65 (quoting *State v. Grell*, 212 Ariz. 516, 135 P.3d 696, 705 & 703 n. 7 (2006)). We further noted in *Sanchez* that, at the time *Atkins* was decided, among the states that exempted the mentally retarded from capital punishment, there was no consensus on the burden of proof. *See id.* at 65 n. 22 ("Of the states with a procedure for determining mental retardation at the time of the *Atkins*

decision, twelve required proof by a preponderance of the evidence, five states by clear and convincing evidence, and one state (Georgia, the very first state to exempt the mentally retarded from execution) by proof beyond a reasonable doubt. Since *Atkins,* the Supreme Court of Indiana has declared that state's provision requiring proof by clear and convincing evidence unconstitutional, and adopted a preponderance of the evidence standard. *Pruitt v. State,* 834 N.E.2d 90, 102 (Ind. 2005).''). Furthermore, we noted, it was clear that *Atkins* "neither mandated, nor indicated a preference, for any particular attribution of the burden of proof." *Id.* at 65.[13]

The *Sanchez* Court explained why we assigned the *Atkins* burden to the defendant by a preponderance of evidence. We began by noting the High Court's general teaching on the function of such standards:

As the High Court has explained, "[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." While the risk of error in a particular adjudication does not vary depending on the standard of proof adopted, the burden allocates that risk between the parties. A more stringent burden of proof imposes on a party a higher risk of an erroneous decision. In a criminal proceeding, an allocation of risk complies with due process "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Generally, in examining state burdens of proof, the High Court gives "substantial deference" to procedures grounded in the com-

---

**13.** Given this background, appellee's suggestion that assigning the defendant a heightened level of proof would violate the federal Constitution is unpersuasive. There is no existing authority from the U.S. Supreme Court imposing such a restriction, albeit some lower courts have expressed concerns with a heightened standard of proof. *See Sanchez,* 36 A.3d at 69–70 & n. 23. Since we reaffirm the preponderance standard here, for the reasons we develop in the text below, we need not speculate whether we believe the U.S. Supreme Court would disapprove of a different, heightened burden.

mon law tradition, weighs their impact on "any recognized principle of fundamental fairness in operation" and, to a lesser extent, gives consideration to contemporary practice. *Id.* at 65 (citations omitted).

With those considerations in mind, we explained why the preponderance standard was the appropriate degree of proof for an *Atkins* claim, emphasizing that affirmative burdens imposed on Pennsylvania defendants are routinely subject to a preponderance standard, that Pennsylvania's statutory capital sentencing scheme has presumptions favoring life, and that the preponderance standard is consistent with the greater weight of authority in this area:

Respecting the degree of proof, the preponderance standard also comports with the burden usually imposed on criminal defendants. Imposing this lowest of standards on the capital defendant will affect *Atkins* determinations "only in a narrow class of cases where the evidence is in equipoise" or where the evidence is equally strong that the capital defendant is mentally retarded and that he is not. The *Atkins* Court recognized the inherent and practical difficulties of determining which offenders are in fact retarded. While we do not believe that the difficulty of the inquiry alone mandates a low probative threshold, given the presumptions favoring life built into Pennsylvania's capital sentencing scheme, we perceive no basis for allocating to the capital defendant the larger share of risk that accompanies burdens of proof more onerous than a preponderance of the evidence. Also, in this Commonwealth, this degree of proof generally comports with that of defendants on whom the burden is placed to prove their affirmative defenses. *See, e.g.,* 18 Pa.C.S. § 315(a) (insanity defense); 18 Pa.C.S. § 313(b) (entrapment defense).

In approving the placement of the burden of proof on the defendant by a preponderance of the evidence, we are in line with the great weight of authority. "Every state that has addressed the issue [pre-dating or after *Atkins* ] has found that the defendant should bear the burden of proof on an *Atkins* claim, and all but six require the defendant to

prove mental retardation by a preponderance of the evidence." Of the states that devised procedures following *Atkins*, all but one jurisdiction, Delaware, chose preponderance of the evidence as the standard of proof. All other statutes that impose a higher standard of proof pre-date *Atkins*. It is also worth emphasizing that, unlike legislators in other states, the elected representatives in Pennsylvania's General Assembly did not exempt mentally retarded capital defendants from the death penalty by statute. Rather, the decision here implements a constitutional restriction newly-recognized by the U.S. Supreme Court in *Atkins*. While the General Assembly may have chosen, and may still choose, to allocate the burden of proof differently, and to affix a different level of proof, at this juncture, we are persuaded that a different allocation or standard of proof are not necessary to vindicate the constitutional right of mentally retarded capital defendants recognized in *Atkins*, or to secure Pennsylvania's "interest in prompt and orderly disposition of criminal cases."

*Sanchez*, 36 A.3d at 69–70 (some citations & footnote omitted).

■ Given this Court's extensive discussion, exploration, and explanation of how to implement *Atkins*, nothing in the Commonwealth's presentation in this case, which was briefed before the decision in *Sanchez* was issued, convinces us that we should rethink *Miller*, *Mitchell* and *Sanchez* and assign the defendant an *Atkins* burden higher than a preponderance of evidence on collateral review. As a policy matter, the General Assembly could fix a weightier burden, and such a burden might or might not ultimately survive Eighth Amendment scrutiny. But, left to pass upon ripe constitutional questions in a legislative void, this Court has consistently approved the preponderance standard since our first expression on *Atkins*, for reasons detailed at some length in *Sanchez* and *Mitchell*.

We are similarly disinclined to formally recalibrate the substantive three-part *Atkins* standard. The fundamental query in *Atkins* differs in kind from that in a case such as *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which ties Eighth Amendment death ineligibility to

an objective mathematical measure, specifically, the defendant's age. The *Atkins* standard this Court has adopted—again, in the absence of a policy determination by the General Assembly—derives from the guidance provided by the U.S. Supreme Court in *Atkins* itself, which also derived from clinical standards. We think it unlikely in the extreme that if the High Court were to devise a national standard, it would much deviate from that which the Court identified as "the clinical definitions" in *Atkins*. Unlike the States that provided the consensus that powered the *Atkins* decision, Pennsylvania did not previously exempt a class of competent murderers from operation of the most severe penalty based upon mental retardation. Although the High Court did not command that the definitions and model it cited were required to satisfy the Eighth Amendment, for a Court tasked with discerning a standard that would pass federal constitutional muster, and in the absence of legislative guidance, the logical starting point obviously is to look to that model. We have done so consistently, from *Mitchell* through *Sanchez*.

We are somewhat more sympathetic to the Commonwealth's requests suggesting an adjustment to the approach in which courts would (1) treat with particular caution any intelligence and aptitude test results conducted not during the defendant's minority, but in anticipation or support of an *Atkins* claim, given the incentive to malinger; and (2) consider evidentiary factors such as those identified by the *Briseno* court concerning adaptive functioning. Although *Atkins* determinations are couched in objective clinical terms—limited intellectual functioning, significant adaptive limitations, and onset prior to 18 years of age—the proof is often highly subjective, whether provided by mental health experts or lay persons. Indeed, the fact that mental health experts can draw contrary conclusions from the same set of circumstances, particularly where little pre-conviction record evidence is available, shows the difficulty with such determinations. That difficulty is only exacerbated in a case like appellee's, where no clinical diagnosis of mental retardation was made prior to age 18, and his claim of mental retardation is forwarded strictly in the context

of seeking relief under *Atkins*, where there is a powerful incentive to malinger and to slant evidence.

■ The prospect of malingering and the incentive to slant evidence to influence a finding of mental retardation are relevant considerations to argue to the *Atkins* factfinder in an appropriate case, not only for purpose of assessing the defendant's post-*Atkins* intelligence and aptitude test results, but also in assessing the defendant's overall case for *Atkins* relief from the death penalty. Having said that, we are not inclined to elevate such considerations to any particular favored or presumptive status, or to expressly instruct courts to treat all retrospective test results with particular caution. The fact remains that there may be some murderers who indeed are mentally retarded, even if the condition went undiagnosed prior to age 18, and prior to the defendant being found guilty of murder and sentenced to death. The *Atkins* factfinder should sort through all relevant evidence and arguments, including logical arguments premised upon perceived incentives, and make the necessary determination. Notably, in the case at bar, the PCRA court did not simply ignore or discount the Commonwealth's argument concerning malingering; the court in fact believed that the Commonwealth's evidence and argument that appellee malingered on his post-*Atkins* tests was "compelling"; the court concluded, however, that such evidence ultimately did not "carry the day."

■ Turning to the Commonwealth's argument based upon the *Briseno* case, after careful consideration, we believe these evidentiary factors, which focus on the adaptive functioning element of the *Atkins* test, may indeed be useful to factfinders faced with *Atkins* claims raised on collateral attack. The *Briseno* factors were recently challenged on federal *habeas corpus* review by a Texas capital prisoner who claimed that reliance on the factors was both contrary to, and an unreasonable application of, *Atkins*. In a divided decision, the U.S. Court of Appeals for the Fifth Circuit rejected the claim, noting that the *Briseno* court had fashioned the evidentiary factors "as a means 'of developing the constitutional restric-

tion' set out in *Atkins* " and that "on their face, nothing about them contradicts *Atkins,* as they were developed explicitly to comply with *Atkins.*" *Chester v. Thaler,* 666 F.3d 340, 346–47 (5th Cir.2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 525, 184 L.Ed.2d 338 (2012). The *Chester* court explained its conclusion in this regard:

> Indeed, the *Briseno* factors obviously evoke *Atkins*'s language which, in turn, evokes the AAMR findings. The first *Briseno* factor, regarding developmental stages, ties to the *Atkins* discussion of the onset of mental retardation before age 18. The second and third, regarding impulsive behavior and leadership, tie to the *Atkins* note that the retarded "often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." The fourth, regarding rational actions and social propriety, ties to the *Atkins* discussion of "understand[ing] the reactions of others." The fifth, regarding focused responses to questions, evokes the *Atkins* discussion of "diminished capacities to understand and process information, to communicate...." The sixth, concerning the ability to deceive, seems related to *Atkins*'s mention of "capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning...." And the seventh, involving forethought and planning, seems tied to *Atkins*'s mention of action "pursuant to a premeditated plan." The *Briseno* factors thus are not arbitrary creations of the Texas judiciary but rather carefully constructed considerations that tie directly to *Atkins.*

*Id.* at 347 n. 1 (citations omitted).

Because the *Briseno* factors relate directly to considerations in *Atkins* and appear to be particularly helpful in cases of retrospective assessment of mental retardation, we approve their use in Pennsylvania. However, we note and emphasize that in *Briseno* the court did not adopt them as presumptions or even as a checklist. Instead, the court forwarded these considerations as "evidentiary factors which factfinders ... might also focus upon in weighing evidence as indicative of

mental retardation." 135 S.W.3d at 8. We will take the same practical and flexible approach, vesting discretion in the *Atkins* factfinder, as the tribunal of first instance, to determine which factors in a given case may be helpful in assessing the defendant's adaptive functioning.

To summarize, we will not alter the standard for measuring mental retardation for *Atkins* purposes in Pennsylvania, nor will we alter the burden of proof, nor will we establish special legal presumptions, or cautionary approaches, to govern all retrospective assessments of mental retardation for *Atkins* purposes. We merely recognize the relevance, reasonability, and logic of the considerations we have discussed above, instruct courts faced with such decisions to be aware of the considerations, and leave the practical application to the necessities and specifics of individual case assessments.

Finally, we need not determine whether the decision below should stand under our discussion of the relevant factors above because we determine, in the next section, that the PCRA court abused its discretion in rejecting the Commonwealth's request to introduce additional evidence pertinent to the *Atkins* question.

## B.

In its second issue, the Commonwealth argues that the PCRA court should have granted its motion to reopen the record and entertain additional evidence implicating appellee in the acquisition and use of cell phones by death row inmates at SCI–Greene. The Commonwealth asserts that this evidence, involving circumstances where appellee "had no reason to falsely display impaired abilities," undermines appellee's *Atkins* claim and, in fact, establishes that the claim was a "sham designed to deceive the PCRA court." Commonwealth's Brief at 43.[14]

14. The evidence in question was obtained by the Commonwealth as fruits of a search warrant. The evidence was subsequently submitted in grand jury proceedings which were ongoing as the PCRA petition was pending below. Upon the Commonwealth's petition, this Court granted leave to file supplemental briefs, including copies of the evidence, under

The Commonwealth asserts that this new evidence reveals that appellee is far more sophisticated than his evidence at the hearing portrayed. The Commonwealth notes that "Amy Leonard," with whom appellee corresponded about cell phones in August 2006, subsequently sent appellee a users' manual for a Motorola SLVR, one of the phones discovered in the death row inmates' possession. The Commonwealth cites transcripts of appellee's recorded phone conversations with family members during August and September 2006 that, when translated into English, appear to include veiled references to the SLVR phone's thinness, its name ("silver") and how it could surreptitiously be brought into the prison by visitors.[15] The Commonwealth notes that the cell phone hidden in a hardcover dictionary and received by another inmate was ostensibly sent by a paralegal in Attorney Billy Nolas's office and asserts that using counsel's name is a common, clever ploy by inmates to secure contraband from outside. The Commonwealth argues that this is likely another instance of appellee's intelligence and cunning, which exceeds that of a mentally retarded person. *Id.* at 43–45.

The Commonwealth additionally cites new evidence that appellee, in trying to get a key for his handcuffs from outside prison, was savvy enough on phone calls that he "took pains to make his words understood without explicitly mentioning a key or handcuffs, cautiously reminded others not to say the word, and spoke in Spanish when he wanted to say something

seal. Since the evidence was not itself a product of the grand jury investigation, its consideration is appropriate here, to assess the Commonwealth's proffer.

15. The Commonwealth adds that in one call, appellee spoke about "that thing I want to get"; appellee also told his mother that he was sending her $300 from his prison account, with $50 for a friend and the remainder for "you know[,] for that." Three days later, the Commonwealth asserts, $300 was deducted from appellee's prison account. In a subsequent phone call, appellee's mother confirmed that the money had been received, $50 had been distributed to the friend, and she would keep the remainder until receiving "new instructions" from appellee. The Commonwealth posits that this evidence demonstrates that appellee had the intelligence to concoct a scheme to get the phone, and also had far more ability to understand and manage money than his *Atkins* witnesses had claimed. Commonwealth's Brief at 45–46.

private." The transcripts include the following phrases, as translated from Spanish: "you know what I was trying to ask you the other day about that . . . [a]bout what was little . . . [y]ou know when, but don't say it . . . [w]hat I always have on my arms . . . [w]hat opens that . . . do you know where you can get one of those. . . ." Appellee also said that handcuff keys could be obtained at the "Shooter Shop" in Philadelphia, that the keys should cost around $15 for a set of two, and that the keys must be by a brand with "the first name is Smith," which the Commonwealth posits is a reference to Smith & Wesson, which makes handcuffs and handcuff keys as well as firearms. The Commonwealth reiterates that all of this new evidence shows appellee to be a far more sophisticated, intelligent, and able individual than his evidence portrayed during the *Atkins* hearing. Commonwealth's Brief at 47–48.

More dramatically, the Commonwealth cites to portions of transcripts of appellee's phone calls with "Jackie," a relative, in August 2006 (two months before his *Atkins* hearings began) as "laughing and commenting about how 'we're all retarded.' " To the Commonwealth, this exchange shows that appellee was aware that counsel was attempting to show that he was mentally retarded and, more so, that appellee was perceptive enough to joke about it. The Commonwealth adds that since its motion to reopen was filed, more evidence of appellee's deceptive intelligence has come to light: a "MySpace" page and a posting on another website. The Commonwealth recognizes that the foregoing is outside the record now, but proffers it to demonstrate what would be included if the Commonwealth's challenge to the PCRA court's denial of its motion to reopen is found to have merit and the *Atkins* issue is remanded for further consideration.

The Commonwealth closes by noting that appellee has also filed various *pro se* petitions in other matters since he has been in prison, at least one of which (involving a conviction for an escape attempt) referred to the PCRA court's *Atkins* ruling as grounds for a viable defense in other contexts. The Commonwealth argues that this evidence likewise suggests that appellee possesses adaptive abilities beyond those that his

witnesses "claimed were possible" at his *Atkins* hearings. The Commonwealth therefore seeks a remand for further proceedings to consider this evidence, which the Commonwealth avers will establish that appellee is not mentally retarded and, furthermore, that appellee committed a fraud upon the PCRA court in claiming otherwise. Commonwealth's Brief at 48–49 (citing *Commonwealth v. Harper*, 890 A.2d 1078, 1082 (Pa.Super.2006) for proposition that "courts simply will not countenance fraud, and when a decision is obtained through its use, the court retains the inherent power to rescind that decision.... Based on the fraud perpetrated upon it, the trial court retained the inherent power to reverse its prior decision.").

Appellee responds that even if the Commonwealth's new evidence is deemed valid, it does not establish fraud upon the PCRA court or that the court's denial of the motion to reopen was an abuse of discretion. Appellee asserts that evidence of his ability to adapt and adjust to incarceration, a highly structured environment, is consistent with mild mental retardation and does not undermine his *Atkins* claim. Appellee adds that the only person he telephoned on the confiscated cell phone who also testified at his *Atkins* proceedings was his cousin, Minerva Rivera, and that her testimony was given little weight by the PCRA court. Appellee's Brief at 44–45.

Appellee further avers that the Commonwealth failed to show that he did or could have done all of the "stunning feats" outlined in its motion or even that such "feats" were inconsistent with mild mental retardation. Appellee posits that there was no need for him to memorize phone numbers to use the smuggled cell phones and he speculates that newer-arrived death row inmates likely showed others how to use the phones or dialed them for one another. Moreover, according to appellee, the references he made to cell phones and handcuff keys during what he knew were monitored phone calls, as well as when he mocked his own *Atkins* claim were, if anything, evidence of a lack of intelligence. Appellee's Brief at 45–48.

Appellee next asserts that the *Harper* case can be distinguished. In *Harper*, conduct by the defendant's mother was

proven to be blackmail that led a key witness to commit perjury out of fear for his life. Here, appellee says, there was evidence to support the PCRA court's original decision, as well as its subsequent refusal to reopen proceedings. Appellee also states that the Commonwealth has already attempted unsuccessfully to use recordings of an inmate-defendant's prison telephone conversations to disprove *Atkins* claims, citing *Commonwealth v. Miller*, 597 Pa. 333, 951 A.2d 322, 326 (2008) (*per curiam*).[16] Appellee's Brief at 46–48.

Appellee next disputes the Commonwealth's assertions that he is capable of using the Internet and preparing *pro se* pleadings as outside the record, misleading, and ultimately insufficient to overturn the *Atkins* ruling in his favor. Appellee states that as a death row inmate, he has no access to the Internet, and that other inmates prepared the *pro se* pleadings in question. Appellee argues that any such evidence should not be considered by this Court. Appellee's Brief at 49–52.

The Commonwealth's supplemental brief, filed with this Court's permission, focuses on evidence developed and submitted in the course of the grand jury investigation into the smuggling of cell phones onto death row at SCI–Greene, evidence that the Commonwealth says "further demonstrates the fraudulent nature of the PCRA case [appellee] presented and the need for additional proceedings." The Commonwealth secured this evidence by means of a search warrant. The Commonwealth describes appellee's extensive correspondence with an "Amy Leonard" which, it says, reveals that appellee is able to communicate and write in English "coherently and extensively," using words such as "paranoia" and "meditation," which would be far beyond the abilities of the mental impairments his PCRA evidence described. The Commonwealth

16. In *Miller*, part of the Commonwealth's effort to refute the defendant's *Atkins* claim was its assertion that "even Appellee believed that the PCRA court favored him, as, in another recorded prison telephone call, he mused that if the PCRA judge were removed from the case, he would surely be put to death." 951 A.2d at 327. The PCRA court ultimately found in the defendant's favor; this Court affirmed the court's order vacating the defendant's death sentences and also concluded that the PCRA court did not abuse its discretion in denying the Commonwealth's motion seeking recusal.

adds that in one letter, appellee included another letter that Ms. Leonard was to send to Elias Pagan, appellee's co-defendant serving life imprisonment at SCI–Fayette; that letter "thanked" Elias for his "help" at appellee's *Atkins* hearing. The Commonwealth asserts that appellee used this indirect yet shrewd method to write at least twenty letters to other inmates, including to three individuals (Luis Pagan, Hector Huertas, and Felix Acevedo) who either testified at his *Atkins* proceeding or submitted affidavits on his behalf. According to the Commonwealth, this evidence reveals that appellee "personally developed and directed" the cell phone smuggling scheme, which required shrewdness and sophistication, and that he was not a merely passive participant.

The Commonwealth adds that this evidence also shows that appellee possessed far more financial understanding and ability than his witnesses had maintained. Thus, the correspondence includes awareness of the cost of various items, like cell phone plans and the dictionary, and even appellee's expression that he wished to invest in the stock market through online trading if Ms. Leonard would handle the trades for him. The Commonwealth notes that the evidence developed for the grand jury also shows that on December 1, 2005, the day appellee was interviewed by prosecution expert Dr. Denkowski, he wrote a letter to Ms. Leonard mocking the mental evaluation process he was undergoing in advance of his *Atkins* proceeding. Appellee allegedly commented in the letter upon the stupidity of the questions and admitted that he gave untrue answers, remarking that " 'a dum question deserves a dum answer' and that he 'kept shooting the dum shit back' " at Dr. Denkowski. In the same letter, appellee complained about having to see "crazy doctors" and that "these … doctors are the real crazy one[s]" and that the "dude was trying to talk to me like if I was a … complete idiot." The Commonwealth avers that the evidence it developed and presented to the grand jury also shows that appellee is a reasonably accomplished reader in both Spanish and English. Commonwealth's Supplemental Brief at 6–8.

The Commonwealth argues that if this evidence is considered, it will be clear that appellee has "abilities well beyond those described to the PCRA court." The Commonwealth reiterates that appellee has a strong incentive to deceive and to "overstate purported impairments" when seeking *Atkins* relief. In light of the PCRA court's expression that this was a close case, the Commonwealth maintains that the outcome obviously might have been different if the court had granted its motion and considered all relevant evidence before making its *Atkins* determination. The Commonwealth argues that the new evidence is not cumulative, was not previously available, was not improperly obtained, and is relevant to show that appellee is not mentally retarded.

Appellee asserts in his supplemental response that remand is not warranted because the Commonwealth has failed to show that the PCRA court's original *Atkins* finding resulted from a fraud upon the court. Appellee argues that even if the Commonwealth's new evidence is considered, it would not affect the PCRA court's finding that appellee is mentally retarded. Appellee claims that the Commonwealth's arguments are based on "cherry-picked examples" that, in any event, show no great degree of intelligence or capability on his part.

Finally, appellee characterizes the Commonwealth's recourse to evidence produced in conjunction with the grand jury investigation as an improper *post hoc* effort to avoid the PCRA court's original ruling. Appellee concludes that inasmuch as grand jury proceedings are conducted unilaterally and confidentially, the use of any such evidence against him would amount to a due process and/or double jeopardy violation.

In a supplemental reply, the Commonwealth describes this case as "a tale of two different individuals" in which appellee's alleged mental and adaptive limitations only manifested "[a]fter *Atkins*, when a diagnosis of mental retardation could serve his purposes." The Commonwealth notes that appellee will be rewarded for his long history of anti-social behavior with *Atkins* relief if the Commonwealth cannot introduce the evi-

dence obtained since the original proceedings, evidence that tends to refute appellee's claim of mental retardation in what the PCRA court explicitly found to be a close case.

The Commonwealth filed its motion in May 2007, after hearings had concluded but before the court made its *Atkins* determination, arguing that the new evidence was relevant to the intellectual and adaptive functioning prongs of *Atkins,* and undermined appellant's *Atkins* claim. The Commonwealth asked the PCRA court to defer making a final determination until the grand jury completed its task so that all of the directly relevant evidence that it had so recently obtained and developed could be placed into consideration. The motion was argued in June 2007, and the court took the request under advisement, while expressing skepticism that it could ever be proven definitively that appellee used the smuggled cell phones himself or had other inmates work them for him. The court ultimately denied the Commonwealth's motion in a brief order in July 2007, citing generally to *Commonwealth v. Smith,* 548 Pa. 65, 694 A.2d 1086 (1997), as authority that a trial court may, within its discretion, decline a motion to reopen for further testimony if the additional testimony would be cumulative. The court did not further address its disposition of the motion in its August 2007 opinion.

In the context of a trial, this Court has held that "a trial court has the discretion to reopen a case for either side, prior to the entry of final judgment, in order to prevent a failure or miscarriage of justice." *Commonwealth v. Tharp,* 525 Pa. 94, 575 A.2d 557, 558–59 (1990). The parties here assume that an abuse of discretion standard applies in this *PCRA/Atkins* context. Not surprisingly given that the *Atkins* decision is new and presumably affects few cases, this Court has not addressed the question of whether and when a PCRA court making an *Atkins* determination should entertain newly-discovered evidence. Nor do the Rules of Criminal Procedure specifically address this question. That is not to say that the Rules provide no guidance, however. Rule 905 provides that amendment to PCRA petitions "shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 905(A). The Rules

118

contemplate the same leeway for answers to PCRA petitions: "The judge may grant the Commonwealth leave to amend the answer at any time, and amendment shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 906(E)(3) (governing answers in death penalty cases); *accord* Pa.R.Crim.P. 906(D) (same substance, governing answers in other cases). The overriding concern is with achieving substantial justice, and that same concern should animate considerations of whether to entertain new evidence.

■ Where a colorable *Atkins* claim arises and is contested on collateral attack, the defendant and the Commonwealth have but one factual opportunity, and it should be a full and fair one for both parties. We do not doubt that the decision whether to entertain newly available evidence ultimately must be a discretionary one for the trial judge, tailored to the nature of the proceeding. In an instance such as this one, factors relevant to the exercise of that discretion would include the timing of the request, the reason for the lateness of the proffer, the substance of the proffer, whether it is merely cumulative, the potential substantive prejudice to the defense, and the overall goal of achieving substantial justice.

In this case, unfortunately, we have but the briefest of explanations from the PCRA court respecting its denial of the Commonwealth's motion, and we cannot remand for further explication as the judge is no longer on the bench. *Commonwealth v. Smith*, the case cited by the PCRA court, involved a direct capital appeal. At the defendant's jury trial, he sought to present two psychiatrists to testify that he was in a state of cocaine-induced psychosis at the time of the murder, and therefore was unable to form the specific intent to kill necessary for first-degree murder. The first expert testified in the defense case-in-chief, describing toxic psychosis and opining that the defendant was suffering from the condition at the time of the murder. However, the second expert did not arrive until after the defense had rested and the Commonwealth's rebuttal expert had already been examined. The trial court denied the defense motion to reopen its case-in-chief so that the second expert could testify regarding toxic

psychosis. This Court upheld the trial court's ruling, as follows: "[The first expert] covered in his testimony the information which, apparently, the defense had planned for [the second expert to] cover. . . . We thus find no clear abuse of discretion on the part of the trial court in refusing to permit the defense to reopen its case-in-chief." 694 A.2d at 1091.

In *Commonwealth v. Tharp*, by contrast, the trial court granted a motion to reopen at trial, which this Court held was not an abuse of discretion. In *Tharp*, the defendant was charged with rape, indecent assault, and corruption of a minor, which requires the perpetrator to be at least 18 years old. At trial, the Commonwealth presented circumstantial evidence of appellant's age to the jury: he was in a Delaware County bar drinking alcohol (at least 21 years old) and had driven without an adult after midnight (at least 18 years old) on the night of the crimes. After the Commonwealth closed its case-in-chief, the defense sought to have the corruption charge dropped as insufficiently supported by evidence of the defendant's age. The Commonwealth moved to reopen its case to present direct evidence of the defendant's age. The trial court granted the motion. This Court found no abuse of discretion because it was understandable why the Commonwealth might believe that direct evidence of age was unnecessary under the circumstances, and once the defendant broached the issue, it was appropriate to allow the Commonwealth to reopen, "to avoid the possibility of a result inconsistent with the true facts." 575 A.2d at 559. *See also Commonwealth v. Evans*, 488 Pa. 38, 410 A.2d 1213, 1216 (1979) (Commonwealth case reopened for presentation of evidence refuting defendant testimony regarding travel plans around time of robbery and murder: "The prosecutor said she did not know until the time of [the defendant's] testimony that such evidence would be relevant and that she was unable to present it sooner because of the time required for the airline to check its records. . . . We find the prosecutor adequately explained the need to reopen and there was no abuse of discretion.").

Upon review, we believe the PCRA court abused its discretion in not entertaining the Commonwealth's new evi-

dence. This case involves a collateral attack with a judicial factfinder, not a jury trial where newly discovered or proffered evidence can be disruptive. The Commonwealth's motion was forwarded before the trial court had rendered its ultimate decision, and it related to a matter where the court had already held twelve days of testimony, and there is no suggestion that the Commonwealth failed to forward the motion in a timely fashion. *See* N.T., 6/4/07 (argument on Commonwealth's motion to reopen). The issue before the court was a novel one—novel since *Atkins* itself was and is novel; the question was posed in a case where no diagnosis of mental retardation had been made in appellee's youth prior to age 18; the issue was difficult to establish definitively on either side, and the Commonwealth's proffer implicated, in part, very practical questions concerning the elements of an *Atkins* determination.

The Commonwealth's proffer specified that this evidence was relevant to the intellectual and adaptive function elements of *Atkins* because it showed appellee's ability, not only to function within prison, but to use his wits and skills to "beat the system" in a manner that required forethought, direction and coordination of others. The evidence also reflected the type of sophisticated thinking (*e.g.*, the idea to smuggle a cell phone onto death row inside the spine of a hardback dictionary) that belied the defense's portrayal of appellee as an individual challenged since childhood to accomplish the most basic tasks of life, and who then grew up to become, at best, a mentally limited foot soldier or enforcer within his drug gang. The Commonwealth also proffers newly-obtained evidence that allegedly demonstrates appellee's relatively sophisticated intellectual and adaptive functioning in other respects, primarily correspondence between appellee and a woman who assisted him in securing the cellphones. The Commonwealth added in its motion that appellee also successfully held a job in prison and independently managed the funds in his prison bank account. The new evidence was proffered to show that at the very time appellee claimed mental retardation, he was, in fact, highly functional and intelligent enough not only to survive

within the prison system, but also, *inter alia,* to circumvent the security and discipline of death row by acquiring, using, and keeping a cell phone until it was discovered and confiscated.

We have no doubt that the Commonwealth's evidence implicates both appellee's intellectual functioning and his adaptive skills. Thus, for example, if the evidence of appellee's recent activities in prison is proven and credited, it rather obviously is probative of these two *Atkins* factors—as is the evidence, if proven and credited, that appellee lied to the Commonwealth's expert, Dr. Denkowski. Nor do we believe that the evidence can fairly be described as merely cumulative of what was already heard. Moreover, given the extensive and over-lapping presentation appellee made concerning his childhood, it would be strange to suggest that this evidence could be viewed as merely cumulative. Appellee's counsel presented lay witnesses who provided a retrospective and anecdotal look at appellee's adaptive abilities in his childhood and in his youth, supplemented by testimony from six mental health experts, none of whom had had contact with appellee prior to appellee's petition seeking *Atkins* relief, much less contact with appellee when he was under the age of 18. The importance of the evidence now proffered is, in some regards, a function of the difficult nature of a retrospective *Atkins* inquiry.

In addition, we believe there is force to the Commonwealth's suggestion, overstated though its supporting rhetoric might be, that the Court should be concerned with the possibility that there is a fraudulent component to appellee's *Atkins* presentation. As we have noted earlier, it can hardly be disputed that the subjective aspects of the *Atkins* inquiry, and the obvious motivation to malinger and to slant evidence, are such that manipulation is always a possibility. Relatively contemporaneous demonstrations of intelligence and ability contrary to the defense presentation, and admissions of deception and malingering—all matters requiring competent, credited proof—should be subject to development when timely uncovered. If proven, this evidence of demonstrated recent

abilities obviously is a powerful counterpoint to evidence concerning appellee's childhood and his supposed continuing intellectual and adaptive functioning deficits.

■ Nor do we believe that allowing the Commonwealth to present the new evidence causes any cognizable prejudice to appellee. The new evidence concerns his own conduct; the evidence is subject to appropriate challenges upon remand; and the purpose of the remand is to merely ensure a more complete picture for the PCRA court so that it may render a definitive judgment which achieves substantial justice. Also weighing in favor of entertaining the evidence is the fact that the PCRA court itself later recognized that the *Atkins* question was a close one.

Finally, we note that the PCRA court's stated reason for refusing to defer consideration and ultimately denying the Commonwealth's motion to reopen is not persuasive. As explained above, we do not view the Commonwealth's proffered new evidence, concerning appellee's actions in prison, as merely cumulative of the evidence already presented. By contrast, ensuring proper and thorough review of all of the available evidence, at a proceeding where both sides will have the full opportunity to challenge and refute each other's presentations, will "avoid the possibility of a result inconsistent with the true facts." *Tharp*, 575 A.2d at 559. As such, we conclude that the PCRA court's failure to grant the Commonwealth's motion to reopen was an abuse of discretion, and the matter must be remanded for further proceedings on *Atkins*, to be conducted in accordance with the guidance provided in this Opinion.

### III. Appellee's Protective Cross–Appeal

In his cross-appeal, appellee raises some twelve issues, implicating both the guilt phase and the penalty phase of trial. It would be premature to pass upon these cross-appeal claims. The outcome of the *Atkins* determination will control whether the penalty phase claims will require appellate review at all, and will also determine whether this remains a capital case falling within our exclusive appellate jurisdiction.

## IV. Conclusion

For the foregoing reasons, we hold that the PCRA court erred in denying the Commonwealth's motion to reopen; accordingly, the PCRA court's decision and accompanying order of August 10, 2007, which found appellee mentally retarded and vacated his death sentences, but otherwise denied relief, is hereby vacated. This matter is remanded for further *Atkins* proceedings consistent with this Opinion. We do not reach appellee's cross-appeal at this time. Jurisdiction is relinquished.

Justice ORIE MELVIN did not participate in the decision of this matter.

Justice SAYLOR, EAKIN, BAER, TODD and McCAFFERY join the opinion.