924 A.2d 612

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Dewitt CRAWLEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 27, 2006.

Decided May 31, 2007.

Shawn Nolan, Esq., for Dewitt Crawley.

Jeffrey Michael Krulik, Esq., Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

**OPINION**

Chief Justice CAPPY.

Appellant Dewitt Crawley requests that this court reconsider the standard for evaluating a determination as to mental retardation in death penalty cases that we announced in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005). For the reasons stated herein, we reaffirm our decision in *Miller*. We also affirm the order of the PCRA court dismissing Crawley's PCRA petition based on its conclusion that Crawley did not establish that he was mentally retarded by a preponderance of the evidence.

Crawley was convicted of first-degree murder and sentenced to death in 1984. This court subsequently affirmed the conviction and sentence of death. *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987). Following the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), Crawley filed the instant Petition for Post–Conviction Relief, which was his third, alleging that he was mentally retarded and thus, ineligible for the death penalty. The PCRA court held a hearing regarding Crawley's intellectual functioning.

At the hearing, Crawley presented the testimony of Dr. Henry Dee. Dr. Dee testified that Crawley's IQ was 84. N.T., 3/4/2004, at 20. He acknowledged that an IQ of 84 was not within the definition of mentally retarded as set forth by the American Psychiatric Association in the Diagnostic and Statistical Manual of Mental Disorders (4th ed.1992) (hereinafter "DSM–IV"). *Id.* at 38. Dr. Dee also stated that Crawley had tested lower at the age of 15 when he was reported as having an IQ of 75. *Id.* at 29–30. Dr. Dee acknowledged that seven months later, his IQ was reported to be 81. *Id.* at 32. Dr. Dee also stated that two years later, Crawley's IQ was reported to be 84. *Id.* at 34. Dr. Dee further opined that Crawley demonstrated deficiencies in adaptive functioning because he had difficulties in school and he had only one job of any

duration. *Id.* at 39. Dr. Dee concluded that Crawley demonstrated moderate impairment in adaptive functioning. *Id.* at 43. On cross-examination, Dr. Dee unequivocally stated that Crawley was not mentally retarded under the definition set forth by the American Association of Mental Retardation (hereinafter "AAMR")[1] or the definition in the DSM–IV. *Id.* at 55 and 67.

Following the hearing, the PCRA court dismissed Crawley's petition. In rejecting Crawley's claim, the PCRA court concluded that Crawley was required to prove his claim by a preponderance of the evidence. The court also held that for purposes of collateral review, it was appropriate for a judge to make the determination as to mental retardation. With regard to the definition of mental retardation, the court employed the definition set forth in the Pennsylvania Mental Health and Mental Retardation Act of 1966 ("MHMRA") as it did not have the benefit of our *Miller* decision. The court noted that the MHMRA definition "contains some ambiguity in interpreting the parameters of 'sub-average' intellectual functioning." PCRA court opinion, 4/30/2004, at 13. Ultimately, however, the court determined that the MHMRA required Crawley to demonstrate "significantly sub-average" intellectual functioning, which was consistent with the definitions set forth in the DSM–IV and the AAMR. Utilizing this definition, the court held that Crawley did not meet his burden of showing that he was mentally retarded.

Crawley appealed to this court requesting that we adopt a broader definition of mental retardation than that set forth in the DSM–IV and the AAMR. Crawley argues that we did not foreclose such a possibility in *Miller* and that we should adopt· the Pennsylvania definition of mental retardation as set forth in the MHMRA. Turning to the PCRA court's opinion, Crawley contends that the court erred in requiring that he demonstrate a "significantly" sub-average general intellectual functioning rather than merely "sub-average" intellectual functioning. This difference is important because sub-average

1. As of January 1, 2007, the AAMR is now known as the American Association on Intellectual and Developmental Disabilities.

intellectual functioning only requires demonstrating an IQ at 1 standard deviation below the norm (which is an IQ of approximately 85 or below), while "significantly sub-average" intellectual functioning requires demonstrating an IQ at 2 standard deviations below the norm (which is an IQ of approximately 70 or below). In this regard, Crawley urges this court to consider the plain meaning definition, as it exists in the MHMRA rather than considering the slant placed on the term by the Department of Public Welfare in interpreting its own regulations. Finally, Crawley requests that we review the evidence he presented under the broader standard and conclude that he is, in fact, mentally retarded.

 As Crawley's first challenge raises a question of law, our standard of review is *de novo* and our scope of is plenary. *Buffalo Twp. v. Jones*, 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002). The challenge in the instant case arises from the United States Supreme Court's decision in *Atkins* and this court's interpretation thereof in *Miller*.[2] Accordingly, a brief recitation of those decisions is necessary.

In *Atkins*, the United States Supreme Court held that mentally retarded persons were ineligible for the death penalty under the Eight Amendment to the United States Constitution. *Atkins*, 536 U.S. at 318–19, 122 S.Ct. 2242. The Court explained, however, that it was up to the individual states to determine how the ban would be applied to those confronting the death penalty. *Id.* at 317, 122 S.Ct. 2242.

Following that mandate, we had the opportunity in *Miller* to consider how allegedly mentally retarded persons currently on death row would be treated in Pennsylvania for purposes of collateral review. We held that a petitioner must establish his claim by a preponderance of the evidence. *Miller*, 888 A.2d at 631. We also indicated that the PCRA judge was the proper person to make such a determination in this context. Finally,

**2.** This court has jurisdiction over this matter under 42 Pa.C.S. § 9546(d). Furthermore, Crawley's PCRA petition was filed on August 14, 2002, which was within 60 days of the *Atkins* decision. Accordingly, it is properly before us under 42 Pa.C.S. § 9545(b)(1)(iii). *Miller*, 888 A.2d at 629 n. 5.

and most importantly for the instant purposes, we held that a petitioner could establish mental retardation under either the DSM–IV or the AAMR. *Id.* Those definitions require a defendant to establish: 1) limited intellectual functioning; 2) significant adaptive limitations; and 3) age of onset. *Id.* at 630. Noting the similarities between the two tests, we stressed that there was no "cutoff IQ," but rather it was the "interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation." *Miller*, 888 A.2d at 631. Like Crawley herein, Miller also urged that we adopt the MHMRA standard of "mental retardation." We rejected Miller's request, noting that the definition in the MHMRA was consistent with the definition set forth in the DSM–IV and AAMR. Further, to the extent it provided a broader definition, we concluded that "a broader definition may be appropriate when the diagnosis is for something other than penological interests." *Id.* Ultimately, after setting forth the standard for determining mental retardation for purposes of collateral review, we remanded the case to the PCRA court for an evidentiary hearing for Miller to establish that he was, in fact, mentally retarded.

Contrary to the assertions of Crawley, there can be no question that *Miller* decided the issue that Crawley raises herein. In *Miller*, we adopted the definition of mental retardation as set forth in either the DSM–IV and the AAMR. Furthermore, we rejected the definition of mental retardation set forth in the MHMRA to the extent it was broader than that envisioned by the DSM–IV and the AAMR. *Miller*, 888 A.2d at 631. Accordingly, we reiterate that for purposes of the imposition of the death penalty in Pennsylvania, the definition of mental retardation is that set forth in the DSM–IV or the AAMR. Crawley's argument requesting a broader definition of mental retardation is without merit.

■ Having reaffirmed our decision in *Miller*, we now consider the PCRA court's actions in this case in light of that decision. Although the court did not have the benefit of our decision in *Miller*, much of what it did was consistent with that decision. First, it applied the preponderance of the

evidence standard. Second, it recognized that the PCRA court judge was the appropriate party to make the determination for purposes of collateral review. Third, and most importantly, it applied a definition of mental retardation closely mirroring the standard we adopted in *Miller*. Indeed, if anything, by using the MHMRA standard, the PCRA court used a broader standard than we recognized in *Miller*. Applying that standard, the PCRA court was persuaded by the fact that Crawley's expert agreed that his IQ was not within the range of mentally retarded as currently set forth in either the DSM–IV or AAMR. PCRA court opinion, 4/30/2004, at 13. Furthermore, while there was evidence that Crawley suffered from cerebral damage, such evidence only supported a finding that Crawley had "sub-average intelligence" and not "significantly sub-average intellectual functioning." *Id.* at 13–14.

In reaching its conclusion regarding Crawley's mental status, the PCRA court necessarily applied the definition of mental retardation to the facts adduced at the hearing. Accordingly, this presents a mixed question of law and fact.

The standard for reviewing mixed questions of law and fact is not settled in Pennsylvania and the question presented is what level of deference the determination by the PCRA court should be given. *Warehime v. Warehime,* 563 Pa. 400, 761 A.2d 1138, 1146 n. 4 (2000) (Saylor, J. concurring). The answer to this question must be evaluated on an issue-by-issue basis, since some mixed questions are more heavily weighted toward fact, while others are more heavily weighted towards law. *See generally Warehime supra.* The more fact intensive a determination is, the more deference a reviewing court should give the conclusion below.

A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. *See* Randall H. War-

ner, *All Mixed Up About Mixed Questions*, 7 J. OF APP. PRAC. AND PROCESS 109, 135 (Spring 2005). We choose this highly deferential standard because "the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate." *Id.* (*quoting Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 307–08 (7th Cir.2002)).

In this case, the PCRA court narrowly focused on Crawley's intellectual functioning. This narrow focus may be improper in a situation in which the IQ is borderline, i.e., 70–75, and does not clearly indicate mental retardation. *See Miller*, 888 A.2d at 631 n. 9. We do not find this focus, however, to be error in this case, since Crawley's own expert acknowledged that Crawley's IQ was not within the range of IQ for mental retardation as defined in the DSM–IV or the AAMR. *See Miller*, 888 A.2d at 630 (defining subaverage intellectual capability as those persons who test below the 65–75 range). The DSM–IV generally defines mental retardation as a disorder that is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below)." *See Miller*, 888 A.2d at 630; DSM–IV at 37. Similarly, the AAMR recognizes the standard for diagnosis to be "two standard deviations below the mean [which is approximately an IQ of 70], considering the standard error of measurement for the specific instruments used and the instrument's strengths and limitations." *See Miller*, 888 A.2d at 630; AAMR at 14. The DSM–IV further explains that the standard error of measurement is approximately 5 points in assessing IQ, although it depends upon the instrument used. *See Miller*, 888 A.2d at 630; DSM–IV at 39. Thus, while we did not adopt a "cutoff" IQ level in *Miller*, the IQ must at least fall within the range of intellectual functioning that could be considered "mentally retarded" as defined in the DSM–IV or the AAMR. Both diagnostic tools envision an upper limit on the range of intellectual functioning fitting within the definition of mental retardation that takes into consideration the standard error of measurement.

It is Crawley's burden to establish mental retardation by a preponderance of the evidence. In this case, we agree with the PCRA court's determination that Crawley did not meet such burden. Accordingly, the order of the PCRA court denying Crawley's PCRA petition is affirmed.

Justice SAYLOR and BAER, Justice BALDWIN and Justice FITZGERALD join the opinion.

Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice CASTILLE, concurring.

I join the learned Majority Opinion in its entirety. I write separately only to emphasize the mistaken assumption that gave rise to this frivolous appeal.

Appellant acknowledges, but only as a point of departure, this Court's controlling decision in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005), which addressed the collateral and practical implementation issues which arose in the wake of the Supreme Court of the United States reversing course and holding, in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that the Eighth Amendment precludes states from executing capital murderers who are mentally retarded. *Miller* was a decision of necessity by this Court because the General Assembly had failed to that point—and it still has failed—to address post-*Atkins* issues.

As the Majority notes, appellant here essentially asks this Court to revisit *Miller* and adopt a standard for evaluating mental retardation that is more to his liking. In my view, appellant is in the wrong forum to forward such a request. The Commonwealth of Pennsylvania never embraced, as an expression of its own sovereignty, the limitation on the death penalty that was adopted in *Atkins*. Instead, *Atkins* is a federal constitutional decision, rendered by the highest court in the land, which binds the states via the Supremacy Clause, irrespective of whether the individual states agree with the interpretation as a matter of policy or constitutional history or

principle. *Atkins* left it to the states to struggle with the practical implications of its broad decision, and it is not yet clear which state responses to the decision will be deemed to pass constitutional muster by that Court.

It obviously would be salutary for the legislatures of the states to thrash about with the definitional and implementation issues arising in the wake of *Atkins*, since the broad subject implicates questions of social policy and it is no easy task to devise a workable and rational standard, given the mysteries of the human mind and the litigation incentives. Moreover, although state legislatures must do the minimum that *Atkins* would command (vague as that command is), they are free to do more, even going so far as to insulate a broader group of marginally impaired capital murderers. In *Miller*, this Court stepped in because the General Assembly had not adopted responsive legislation and because the issue presented was ripe for decision. Faced with Pennsylvania legislation that did not contain **any** *Atkins* restriction, and obliged and authorized only to do the constitutional minimum required by *Atkins*, this Court rendered its considered decision on the standard to govern *Atkins* challenges in Pennsylvania.

Having spoken in *Miller* only because the issue was defaulted to us, and bound only by those federal constitutional restrictions which are clearly articulated by the U.S. Supreme Court, I would not "revisit" the *Miller* standard upon mere request, or because a particular defendant thinks he has conjured a better policy argument. This Court is not a legislative body, much less a super-legislature. Our role is not to tinker with the *Miller* test for tinkering's sake or for policy's sake. In my view, there are only three possible cognizable challenges a capital defendant can forward in the wake of *Miller*: (1) I am ineligible for the death penalty under *Miller*; (2) the *Miller* standard as stated or applied to me violates the federal Constitution as articulated in the following, specific ruling of the Supreme Court of the United States (this would have to be *Atkins* or a post-*Atkins* decision of the High Court); or (3) the General Assembly has enacted a statute addressing *Atkins*, it constitutionally displaces *Miller*, and it

entitles me to death ineligibility whether *Miller* would or not. None of these scenarios is presented here. As such, this challenge, and any like it, should be speedily and summarily denied. The only proper forums for appellant's "policy" arguments are the U.S. Supreme Court, which innovated the *Atkins* restriction in the first instance and imposed it against the states, or the Pennsylvania General Assembly, which certainly has the power to go further than *Miller* and *Atkins,* if it chooses to do so. The frivolous filing in this case should not be permitted to delay the administration of justice.

Justice EAKIN, concurring.

I join the majority opinion. I write separately to reiterate my concerns expressed in *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624, 633 (2005) (Eakin, J., concurring) (stating "no legislation has been passed to [set mental retardation standards for capital defendants since *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and] this is inherently a legislative matter—it is hoped that the legislature would also act without further delay."). It has been almost five years since *Atkins* was decided, and the legislature has still not acted in this regard. In the continued absence of legislative action, I agree with the three-part construct Justice Castille set forth in his concurring opinion. *See* Concurring Op., at 231–32, 924 A.2d at 617.