J-A26040-22

2023 PA Super 232

CLARENCE DAVID CORYELL, AND : IN THE SUPERIOR COURT OF
SANDRA CORYELL, H/W : PENNSYLVANIA
:
v. :
:
STEVEN MORRIS, JASON DAWSON, :
ROBIZZA, INC., AND DOMINO'S :
PIZZA LLC :
:
: No. 1977 EDA 2021
APPEAL OF: DOMINO'S PIZZA LLC :

Appeal from the Judgment Entered September 21, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180602732

BEFORE: BOWES, J., KING, J., and PELLEGRINI, J.*

DISSENTING OPINION BY BOWES, J.: **FILED NOVEMBER 8, 2023**

I respectfully dissent. In my view, the majority both conducts an improper review and reaches the wrong ultimate disposition. For the reasons that follow, I would affirm the judgment.

First, although the matter *sub judice* comes to us on appeal from a judgment entered upon a verdict reached at a jury trial, the learned majority elects to review the propriety of a pretrial motion for summary judgment. As this Court recently explained:

> This Court has recognized that in cases where "a summary judgment motion is based on the sufficiency of the evidence to prove the plaintiff's claims, once a case goes to trial and evidence is presented at trial, the denial of summary judgment is moot and the sufficiency of the evidence must be analyzed based on the trial record." ***Xtreme Caged Combat v. Zarro***, 247 A.3d 42, 50–51

---

Retired Senior Judge assigned to the Superior Court.

(Pa.Super. 2021) (citing *Whitaker v. Frankford Hospital of City of Philadelphia*, 984 A.2d 512, 517 (Pa.Super. 2009)).

In *Whitaker*, this Court noted that, once the parties proceeded to trial, the parties presented evidence, and a verdict was entered in the plaintiff's favor, the defendants' motion for summary judgment became moot and the "issue became whether the trial court erred in failing to grant them JNOV." *See also Ortiz v. Jordan*, 562 U.S. 180, 184, (2011) (an order denying summary judgment "retains its interlocutory character as simply a step along the route to final judgment. Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion.") (citation omitted).

A recent panel of this Court held in *Yoder v. McCarthy Constr., Inc.*, 291 A.3d 1 (Pa.Super. 2023), that "where summary judgment is denied and **the same claim** then proceeds to trial, post-trial and appellate review must focus on whether [JNOV] is required, not on whether summary judgment or nonsuit were improperly denied." *Id*. at 13 n.15 (emphasis in original).[5]

---

[5] We recognize that this Court's precedent has not always directly addressed whether a party may appeal the denial of a motion for summary judgment after a trial has been held. *See Windows v. Erie Ins. Exch.*, 161 A.3d 953, 956-57 (Pa.Super. 2017) (reaching the merits of a challenge to the denial of summary judgment without explanation as to why the denial was reviewable); *Krepps v. Snyder*, 112 A.3d 1246, 1257-60 (Pa.Super. 2015) (same). This Court has on occasion reviewed the merits of challenges to the denial of summary judgment after a trial has been held. *See Brownlee v. Home Depot U.S.A., Inc.*, 241 A.3d 455, 2020 WL 6197405, *3-4 (Pa.Super. October 22, 2020) (non-precedential decision).

*Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.*, 297 A.3d 404, 412 (Pa.Super. 2023) (cleaned up).

Here, Domino's asserted pretrial that it was entitled to judgment as a matter of law because the Coryells had "not produced any evidence or

documents to support the allegations in their Amended Complaint against [Domino's]." Domino's Motion for Summary Judgment, 3/2/20, at ¶ 44. Citing not only the 2006 Franchise Agreement and the 2016 operating standards, but also the affidavits and depositions of its employees and the franchisee, Domino's maintained that "the evidence and documents produced show that [Domino's] has never had any right to, nor did it ever participate in the hiring, training and/or supervising of the individuals [that Robizza] employed," and thus "[t]he evidence simply does not indicate any liability for this motor vehicle accident on the part of [Domino's]." *Id*. at 47- 48.

Hence, Domino's moved for summary judgment on the basis that the Coryells failed to produce sufficient evidence to support their claim of the vicarious liability of Domino's, and, after the motion was denied, the case proceeded to trial on the same claim raised in the summary judgment motion. Pursuant to *Whitaker*, *Xtreme*, *Yoder*, and *Turnpaugh*, this Court's duty on appeal is to examine the trial evidence to determine whether Domino's was entitled to JNOV, not to review the pretrial denial of summary judgment upon the then-extant record.

The majority opts to rely upon *Windows*, *Krepps*, and the non-precedential decision in *Brownlee* to address the prior denial of summary judgment rather than the countervailing authority of *Whitaker*, *Xtreme*, *Yoder*, and *Turnpaugh*. I would follow the latter, more recent cases as presenting the sounder approach, as it is in accord with well-settled law on

the analogous challenges to evidentiary sufficiency in criminal cases.[1]

*Accord*, *e.g.*, *Commonwealth v. Lee*, 662 A.2d 645, 650 (Pa. 1995) (holding subsequent conviction at trial rendered moot challenge to denial of pretrial motion for *habeas corpus* relief on the basis that the Commonwealth failed to proffer sufficient evidence to establish a *prima facie* case); *Commonwealth v. Taylor*, 596 A.2d 222, 225 (Pa.Super. 1991) (observing that, to obtain appellate review of the denial of a pretrial challenge to the sufficiency of the evidence to warrant a trial, the defendant must immediately petition for an interlocutory appeal by permission, as the issue is mooted by the subsequent proffer of sufficient evidence at trial).

If Domino's wished to seek appellate review of the denial of its motion for summary judgment before trial, it could have sought permission to file an interlocutory appeal pursuant to 42 Pa.C.S. § 702(b). *See Turnpaugh*, *supra* at 412 (Pa.Super. 2023). By electing to instead proceed to trial, Domino's allowed the pretrial sufficiency challenge to become moot. However, it properly preserved the issue of whether the facts of this case as established

---

[1] While my perspective aligns with that of *Whitaker*, *Xtreme*, *Yoder*, and *Turnpaugh*, I concede that our jurisprudence has been inconsistent. Accordingly, the resolution of the issue by an *en banc* panel of this Court would ease the lingering confusion among the bench and bar. Considering our omnipresent effort to find consistency in the law, I believe that it is time for this Court to resolve this dissonance so that all similarly-situated litigants are treated the same.

at trial were sufficient to give rise to vicarious liability by raising the claim in its motion for JNOV.

I find the majority's insistence upon reviewing the summary judgment determination under these circumstances perplexing due to the complete lack of necessity for it given the framework the majority opts to employ. The majority opines that this case presents a purely legal question because the evidence whose sufficiency is at issue consists only of the parties' written agreements, and not any disputed facts established through testimony or other documents. The majority further expressly acknowledges that same standard of review applies to denial of summary judgment or JNOV when a pure question of law is presented. *See* Majority Opinion at 15. Consequently, the majority's pronouncements on the post-trial reviewability of summary judgment amount to mere *dicta*. In my view, this gratuitous further-muddying of already-murky waters is as injudicious as it is unwarranted.[2]

Were the majority correct that we faced a purely legal issue in this case, the prevailing reason for precluding post-verdict review of the denial of a motion for summary judgment, *i.e.*, the preeminence of the trial record, would

_____

[2] The majority goes so far as to suggest that it would be unfair not to review the summary judgment motion in this case because there was some precedent upon which the parties could have selectively relied in deciding to proceed to trial rather than pursuing a permissive interlocutory appeal. *See* Majority Opinion at 13. I find this contention both baseless, since no right to review was lost here, and ill-advised, insofar as it encourages litigants to ignore countervailing precedent, of which there was plenty in this case, and to argue that this Court is somehow thereby estopped to apply it.

be diminished significantly. However, I disagree with the majority's holding on this front as well. In my view, the nature of the parties' relationship is a mixed question of law and fact which, in this instance, was properly submitted to the jury.

When the determination of whether a legal threshold or definition has been met varies from case to case, with the answer depending upon the particular set of facts involved, then the issue is a mixed question of law and fact. *See*, *e.g.*, *J.S. by M.S. v. Manheim Twp. Sch. Dist.*, 263 A.3d 295, 305 n.11 (Pa. 2021) (noting whether a statement constitutes a punishable true threat is a mixed question of law and fact); *Messina v. E. Penn Twp.*, 62 A.3d 363, 366 (Pa. 2012) (observing that issue of whether an ordinance was invalid based upon failure to readvertise after changes were made to a zoning map presented mixed questions of law and fact); *Gentex Corp. v. W.C.A.B. (Morack)*, 23 A.3d 528, 534 (Pa. 2011) (concluding that question of adequate notice presented a mixed question of law and fact and, "[a]s this issue is significantly fact driven, great deference is to be given to the lower tribunal's determinations"); *Commonwealth v. Crawley*, 924 A.2d 612, 615–16 (Pa. 2007) (holding that whether a petitioner fit the definition of "mental retardation" was a fact-intensive mixed question of law and fact).

The standard of review for mixed questions of law and fact "must be evaluated on an issue-by-issue basis" because "some mixed questions are more heavily weighted toward fact, while others are more heavily weighted

towards law." *Id*. at 615. "The more fact intensive a determination is, the more deference a reviewing court should give the conclusion below." *Id*. at 615-16.

The issue before us is whether Domino's was properly determined to be vicariously liable for the negligence of its franchisee's employee. As our Supreme Court has explained:

> Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the ability to pay.

*Green v. Pennsylvania Hosp.*, 123 A.3d 310, 316 (Pa. 2015) (cleaned up).

In determining whether the relationship between two parties triggers vicarious liability, the focus is on the control that the purported principal has over the purported agent "with respect to his physical conduct in the performance of the services for which he was engaged[.]" *Cox v. Caeti*, 279 A.2d 756, 758 (Pa. 1971).

> The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result[.]

***Green v. Indep. Oil Co.***, 201 A.2d 207, 210 (Pa. 1964). Phrased differently, "[a] servant is an agent whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master; that is, a master controls not only the results of the work, but the manner in which the work is to be performed." ***Juarbe v. City of Philadelphia***, 431 A.2d 1073, 1076 (Pa.Super. 1981). "It is the element of **continuous subjection** to the will of the principal which distinguishes the agency agreement from other agreements." ***Myszkowski v. Penn Stroud Hotel, Inc.***, 634 A.2d 622, 626 (Pa.Super. 1993) (cleaned up, emphasis in original).

In the context of a franchisor-franchisee relationship, the question of the agency is answered by examining "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." ***Id***. If an agreement gives the principal the right to control the agent's day-to-day performance, then it matters not whether the principal actually exercised that right. ***See Coleman v. Bd. of Ed. of Sch. Dist. of Philadelphia***, 383 A.2d 1275, 1279 (Pa. 1978) ("The test is thus framed in terms of the right and power to exercise such control, not in terms of whether the right and power were actually exercised or whether they were delegated to another."). However, evidence of actual control exerted by the principal outside of the parties' agency agreement may also establish a level of control that gives rise to vicarious liability. ***See George v. Nemeth***, 233 A.2d 231, 233 (Pa. 1967) ("Although the Distribution Agreement signed by Nemeth and Freihofer

- 8 -

specifically refers to their relationship as being one of an independent contractor, this is not determinative of the matter for it is the actual practice between the parties which is crucial.").[3]

The above case law manifestly indicates that whether Domino's exerted sufficient control over Robizza to render it vicariously liable for the Coryells' damages is a mixed question of law and fact. Indeed, I posit that the nature of the relationship between Robizza and Domino's is such a fact-intensive inquiry that we are bound to give great deference to the decision below. **See Crawley**, **supra** at 615–16. Further, it is well-settled that "[i]f the facts as to such relationship are in dispute, **it is the function of a jury to determine the precise nature of the relationship between the parties**[.]" **Cox**, **supra** at 758 (emphasis added) (citing **Feller v. New Amsterdam Cas. Co.**, 70 A.2d 299, 300 (Pa. 1950)). **See also Juarbe**, **supra** at 1076 (same). It

_____

[3] At times, the majority acknowledges that the issue in the case *sub judice* is what the actual relationship was between Domino's and Robizza, not how the Franchise Agreement chose to characterize it. **See** Majority Opinion at 25, 30. Yet the majority also suggests that our task is to determine whether the Franchise Agreement unambiguously calls for a finding of vicarious liability, as if we were deciding the parties' rights and obligations to each other pursuant to their contract. **Id**. at 14-16. There is no question here that the Franchise Agreement plainly states that the parties intended for Robizza to be an independent contractor. However, while the parties could agree to indemnify each other for third-party claims, their agreement has no bearing upon the Coryells' ability to hold Domino's vicariously liable for Robizza's negligence if Domino's, in fact, had sufficient control over Robizza through its rights under the agreement, its various operating standards, and its actual practices to establish an agency relationship. Hence, the lack of contractual ambiguity as to the parties' characterization of their relationship is a red herring.

is only "where the facts are not in dispute, [that] the question of the relationship becomes one for determination by the court[.]" *Cox*, *supra* at 758.

Having a jury determine the existence of vicarious liability is hardly a rarity. Quite the opposite, "[**o**]**rdinarily**, the question of the existence of a principal-agent or master-servant relationship is one of fact for the jury to determine." *Breslin by Breslin v. Ridarelli*, 454 A.2d 80, 82 (Pa.Super. 1982) (emphasis added). Pennsylvania Courts have long and oft approved submitting to the jury the question of the existence of a master-servant or principal-agent relationship. *See*, *e.g.*, *Tonsic v. Wagner*, 329 A.2d 497, 501 (Pa. 1974) (holding question of whether a hospital, in addition to operating surgeon, was liable as a master for the negligence of its personnel during an operation involved "issues of fact which should have been submitted to the jury with proper instructions"); *Brown v. Shirks Motor Exp.*, 143 A.2d 374, 379 (Pa. 1958) (holding trial court properly assigned to the jury the question of whether tortfeasor was working in the course and scope of his employment with his employer at the time of his negligence or he had been under control of a different master); *Kissell v. Motor Age Transit Lines*, 53 A.2d 593, 596 (Pa. 1947) (same); *Rosen v. Diesinger*, 158 A. 561, 562 (Pa. 1932) (same); *Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*, 182 A.3d 1011, 1027 (Pa.Super. 2018) (reversing grant of summary judgment because whether a principal-agent relationship existed presented a jury question);

*Lynn v. Cepurneek*, 508 A.2d 308, 316 (Pa.Super. 1986) (quoting *Dunmire v. Fitzgerald*, 37 A.2d 596, 599 (Pa. 1944)) ("Where, as here, it is not entirely clear who was the controlling master and different inferences in that regard can fairly be drawn from the evidence, it is for the jury, not the court, to determine agency." (cleaned up); *Simmons v. St. Clair Mem'l Hosp.*, 481 A.2d 870, 874 (Pa.Super. 1984) (holding trial court erred in not permitting the jury to determine the relationship between the parties for, while the evidence of agency "may have been tenuous," there was a factual dispute for the jury).

I submit that the trial court in the instant case properly tasked the jury with deciding whether Domino's had *de facto* or *de jure* control over Robizza such that Robizza was the agent of Domino's for purposes of vicarious liability. Indeed, a review of Domino's motion for JNOV and the Coryells' response readily reveals the conflicting facts presented at trial.

In arguing that it was entitled to judgment notwithstanding the jury's contrary verdict, Domino's contended that the evidence at trial was not "sufficient to sustain the jury's verdict . . . finding that Domino's, as a franchisor, is vicariously liable for the acts or omissions of the employees of its franchisee, Robizza[.]" Motion for Post-Trial Relief, 8/23/21, at 2. Asserting that there was no proof that Domino's had a right to control, or actually exercised control over, the day-to-day operations of the franchise, Domino's cited the Franchise Agreement; the trial testimony of Jason Dawson,

who owned franchisee Robizza; the trial testimony of Jason Devereaux, Domino's director of franchise services; and the video deposition of January Shook, the Domino's area leader responsible for enforcing the Franchise Agreement with Robizza.

Domino's highlighted provisions of the Franchise Agreement that: (1) placed sole responsibility for training employees; (2) indicated no modifications to operating standards would alter the franchisee's status under the agreement; (3) stipulated that the franchisee must directly supervise the store; and (4) identified the parties as independent contractors. *Id*. at 10 (citing, *inter alia*, Franchise Agreement, 8/15/06, at ¶¶ 10.2, 15.4, 15.6, 22.8). Regarding that last point, ¶ 22.8 of the Franchise Agreement defined the parties' relationship as follows:

> The parties to this Agreement are independent contractors and no training, assistance or supervision which we may give or offer to you shall be deemed to negate such independence or create a legal duty on our part. We shall not be liable for any damages to any person or property arising directly or indirectly out of the operation of the Store, including but not limited to those damages which may occur while your employees are making or returning from making deliveries, or arising out of your delivery service policies. Nor shall we have any liability for any taxes levied upon you, your business, or the Store. The parties further acknowledge and agree the relationship created by this Agreement and the relationship between us is not a fiduciary relationship nor one of principal and agent. Furthermore, we have no relationship with your employees and have no rights, duties, or responsibilities with regard to their employment by you. You acknowledge and agree that you do not have the authority to act for or on behalf of us or to contractually bind us to any agreement. No party to this Agreement shall have any authority to assume any liability for the acts of the other, or to alter the legal relationships of the other. . . .

Franchise Agreement, 8/15/06, at ¶ 22.8.

Domino's further cited Mr. Dawson's testimony that he "at all times solely owned Robizza and operated it 'as an independent business[;]'" that "Robizza leased the premises and paid all of its own bills, expenses, and taxes[;]" and that all of the food was "made from ingredients owned by Robizza in equipment that Robizza owned and [was] sold at prices set by Robizza directly to its customers." Motion for Post-Trial Relief, 8/23/21, at 6 (quoting N.T. Trial, 8/4/21(AM), at 71, 82-88, 97-100). Domino's also relied upon Ms. Shook's testimony in asserting that Domino's never had an employee working at the store, that "Mr. Dawson exclusively recruited, hired, trained, scheduled, supervised, and paid all of Robizza's employees" because Robizza was solely responsible for those matters, and that "Domino's was only present in the Robizza store three to five times a year for approximately an hour at a time for a quality review of Robizza's operations." *Id*. at 6-7 (citing Videotaped Deposition of January Shook, 7/27/21, at 72, 86-103). Domino's additionally highlighted Mr. Devereaux's testimony contrasting the operation of Robizza's store from those owned by Domino's. In particular, Mr. Devereaux indicated that all of the employees, including drivers, in corporate-owned stores are directly hired, trained, and supervised by Domino's. *Id*. at 7 (citing N.T. Trial, 8/5/21(AM), at 43-44).

In their response to Domino's motion for JNOV, the Coryells pointed to testimony from these same witnesses suggesting that, despite all the

declarations of Robizza's independence, Domino's had the right to, and did, dictate not just the results that Robizza produced, but also the precise manner in which Robizza achieved them. For example, Mr. Dawson and Ms. Shook both testified that Domino's had the right pursuant to the Franchise Agreement to set standards that Robizza was mandated to follow. *See* Brief in Opposition to Post-Trial Motion, 9/13/21, at 14 (citing N.T. Trial, 8/4/21(AM), at 50-51; Videotaped Deposition of January Shook, 7/27/21, at 24-25). Mr. Devereaux testified that Domino's exercised its contractual right by adopting not only product standards to ensure the quality of food associated with the Domino's brand, but operating standards that mandated how Robizza would operate its store. *Id*. at 14-15, 22 (citing N.T. Trial, 8/5/21(AM), at 9-16). These standards could be changed by Domino's at any time, without Robizza's approval, to dictate Robizza's operations. *Id*. (citing N.T. Trial, 8/5/21(AM), at 13-14). Specifically, Domino's issued operating standards in July 2016, nearly ten years after the parties entered into the Franchise Agreement, that Robizza was required to abide by. *Id*. (citing N.T. Trial, 8/5/21(AM), at 13; Videotaped Deposition of January Shook, 7/27/21, at 8). Mr. Dawson testified that these standards governed the day-to-day operations of the Robizza store. *Id*. at 21 (citing N.T. Trial, 8/4/21(AM), at 99).

Along with this testimony, the Coryells introduced the fifty-page 2016 operating standards. This document provided rules governing such extensive

areas of operation as how long employees' fingernails and facial hair could be; the size and amount of employees' jewelry; when the store must be cleaned and what types of supplies were permitted; methods of acceptable payment by customers; what topics must be covered in employee training; how much cash, including personal funds, driver were permitted to carry in the delivery vehicles; and that drivers not carry mace or other types of personal protection in the delivery vehicles. *Id*. at 17-20.

I posit that the above demonstrates that there was conflicting evidence of the nature of Robizza's relationship with Domino's such that it was for the jury to evaluate that evidence and decide, upon applying the trial court's instructions as to the law, whether Domino's actually exerted, or had the authority to exert, control over the day-to-day operations of the Robizza Domino's store to make Domino's vicariously liable for the negligence of a Robizza employee.

Moreover, even if the trial court did err in allowing the jury to resolve a question of law in reaching its verdict, the error was plainly harmless, as the trial court in its opinion expressed its wholehearted agreement with the jury's conclusion. *See* Trial Court Opinion, 4/18/22, at 11 (concluding that "there was overwhelming evidence" that Robizza was not "free to operate under the agreement in any way other than in a master/servant relationship"). *See also Schneider v. Girard Tr. Bank*, 218 A.2d 259, 260 (Pa. 1966) ("If this be error, it is harmless error since the lower court, in its opinion for the court

*en banc*, indicated that had it chosen to resolve the ambiguity presented by the agreements its decision would have been the same as that of the jury.").

Turning to the question of whether Domino's was entitled to judgment notwithstanding the jury's verdict, I observe that the following standard of review pertains:

> [W]e review the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. In this context, an abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will.
>
> When reviewing the denial of a request for JNOV, the appellate court examines the evidence in the light most favorable to the verdict winner. Thus, the grant of JNOV should only be entered in a clear case.
>
> There are two bases upon which a movant is entitled to JNOV: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. When an appellant challenges a jury's verdict on this latter basis, we will grant relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.

**Turnpaugh**, **supra** at 413 (cleaned up).

My review of the record reveals the jury's verdict to be contrary to neither to the law nor the evidence. Rather, I agree with the *amicus curiae* Pennsylvania Association for Justice that "[i]t is difficult to imagine how Domino's" is able to assert that there was "no evidence in the record that Domino's exercised actual control over the daily operations of Robizza's business" unless Domino's believes that actual control "means having a person

- 16 -

from Domino's corporate offices physically present in the store telling everyone to do at every moment."[4]   Brief of *Amicus Curiae* at 23 (quoting Domino's brief at 18).

The Domino's Franchise Agreement and operating standards left Robizza with practically no discretion how to conduct the day-to-day operations of its franchise store.  In addition to the mandates discussed above, Domino's also: (1)  specified the terms of the store's lease and site plan, with the right to order refurbishment, and the operating hours of the store; (2) commanded the use of a specific IBM, Inc. platform for accepting and processing employment applications; (3) forbade the hiring of employees who had tattoos or "unprofessional" body modifications that could not be covered while detailing the colors and style of clothes employees could wear and when they could and could not wear them; (5) specified a list of acceptable computer and server models and processing speeds; (6) obligated the franchisee to maintain records of weekly or monthly sales, bank deposits, cancelled checks, and statements, receipts for food purchased, counts of types of pizzas sold; (7) outlawed the promotion of free delivery; required the use of approved

_____

[4] The *amicus* observes that "[t]here is reason to believe [that] this is exactly what Domino's means," as Domino's argues as follows:  "A representative of Domino's was present in the store only about five hours per year to observe (but not to direct) Robizza's operations.  Those circumstances hardly constitute daily operational control that 'continuously subjugated' Robizza to the will of Domino's."  Brief of *Amicus Curiae* at 23 n.1 (quoting Domino's brief at 26).

types of a safe in the store and the deposit therein of anything more than $150 that could be kept in the cash registers; (8) preluded the use of delivery vehicles with "excessive" wear and tear or debris; (9) mandated that the store feature at least three telephones and digital clocks viewable from various areas of the store; (10) banned the presence of gaming machines or any form of literature not related to work; and (11) required employees to deal with complaining customers by "apologiz[ing], giv[ing] them what they want, [and] giv[ing] them something extra." **See** Domino's Pizza Operating Standards, 7/16. Critically, violation of these operating standards, observed upon unannounced inspections that Domino's had the right to conduct at any time, subjected Robizza to termination of its franchise. **See** Franchise Agreement, 8/15/06, at ¶ 18.2.2.

To me, it is plain that this is not a franchisor-franchisee relationship like the one at issue in **Myszkowski**, where the franchisee paid Best Western a flat fee to use the trademark, contributed to advertising, and was otherwise free to operate the hotel as they saw fit so long as it did not fall below minimum quality standards. **See Myszkowski**, **supra** at 626-27. Nor did Robizza have the type of day-to-day control as the franchisee in **Green v. Independent Oil Co.** who was obligated to purchase all fuel and oil from the franchisor, but was permitted to sell other wares of his choosing, keep all profits, and handle all matters of employing store workers. **See Green v. Indep. Oil Co.**, **supra** at 210.

As detailed above, Domino's used its operating standards to continuously subjugate Robizza to Domino's will as to the minutia of the store's staffing and daily operation far beyond the minimum quality threshold addressed by the product standards. The Franchise Agreement specified that, rather than merely pay a yearly fee or buy supplies from the franchisor, Robizza was obligated to pay Domino's a set percentage of Robizza's weekly receipts. *See* Franchise Agreement, 8/15/06, at ¶ 6.1. Further, Domino's retained the right to require Robizza to give it access to Robizza's bank account to allow Domino's to transfer to itself royalty fees and advertising contributions. *Id*. at ¶ 6.4.

Consequently, the instant relationship is far more akin to that at issue in *Juarbe*, in which this Court held the trial court erred in granting judgment as a matter of law to the franchisor. We required the case to be submitted to the jury to determine vicarious liability based upon the following:

> [I]t cannot be said that a clear co-equal independent contractor relationship exists where there is evidence that one party can: randomly inspect the other's operation; compel him to keep it neat and orderly; control his hours of operation; control the type and appearance of clothing worn by him and his employees; require him to adjust customer grievances; set the prices he must charge; specify the quantity and quality of products he must dispense but yet have sole discretion on delivery and allocation of such products; prohibit him from posting unauthorized signs; and compel him not to sell products of a competitor. When such powers are maintained under the threat of a termination of the operator's lease and business at the end of a brief term, Exxon's exercise of substantial control is evident.

*Juarbe*, *supra* at 1078.

In sum, it is readily apparent to me that the judgment entered upon the jury's verdict in this case is sound. Domino's control over Robizza was sufficiently robust and extensive to deem Robizza its servant or agent for purposes of vicarious liability for the negligence of Robizza's employee.[5] Therefore, I would affirm the trial court's denial of Domino's motion for JNOV, and so must respectfully dissent.

---

[5] The majority notes that its finding that Domono's did not exert sufficient control to establish an agency relationship with its franchisee is in accord with decisions in other states. *See* Majority Opinion at 45-46 n.16 (collecting cases). I am similarly able to offer authority from other jurisdictions in support of my position that Domino's did establish a principal-agent relationship through its pervasive control over the franchisee. *See Domino's Pizza, LLC v. Wiederhold*, 248 So.3d 212, 222 (Fla. Dist. Ct. App. 2018) (affirming jury's finding that Domino's exerted sufficient control to be vicariously liable for the delivery driver's accident and declining Domino's "invitation for this Court to reweigh the evidence or recharacterize its control as being limited to brand maintenance activities"). *See also Viado v. Domino's Pizza, LLC*, 217 P.3d 199, 207 (Or. App. 2009) (holding a reasonable jury could conclude that "Domino's exercised sufficient control over [its franchisee] to establish an agency relationship," although ultimately the court ruled that vicarious liability did not follow based upon the specific-instrumentalities paradigm that the majority acknowledges is not the law in Pennsylvania).